[This opinion has been published in *Ohio Official Reports* at 83 Ohio St.3d 67.]

THE STATE EX REL. HORVATH, APPELLANT, *v.* STATE TEACHERS RETIREMENT BOARD, APPELLEE.

[Cite as *State ex rel. Horvath v. State Teachers Retirement Bd.*, 1998-Ohio-424.]

*Teachers—State Teachers Retirement System—Nature and extent of a contributor's protected property rights in the STRS are determined solely by the statutes that govern the system—Public school teachers possess contract rights in any STRS benefit, when.*

1. Mandatory teacher contributions to the State Teachers Retirement System result from economic legislation designed to benefit retired and disabled public school teachers and their survivors and beneficiaries and, when placed in the fund, lose their character as private property. Accordingly, the nature and extent of a contributor's protected property rights in the State Teachers Retirement System are determined solely by the statutes that govern the system.

2. Public school teachers do not possess contract rights in any State Teachers Retirement System benefit unless and until the benefit vests by operation of R.C. 3307.711.

(No. 97-1197—Submitted May 13, 1998—Decided August 19, 1998.)

APPEAL from the Court of Appeals for Franklin County, No. 96APE08-983.

————————————

{¶ 1} Appellant, Theodore Horvath, initiated this action for declaratory judgment, mandamus, and injunctive relief to recover interest on mandatory contributions to the State Teachers Retirement System ("STRS") made by his wife, Sydney Horvath, while publicly employed as an art teacher between 1951 and 1964. Although Mrs. Horvath never resumed her career as a public school teacher, she

left her contributions in the fund until her death at age fifty-nine in June 1989. At the time of Mrs. Horvath's death, R.C. 3307.651 had taken effect to permit the crediting of interest on teacher contributions after August 31, 1959 only upon retirement, and only in the event that the sum of the account at retirement is a factor in determining the allowance. R.C. 3307.651(2) and (3). Because Mrs. Horvath died before she became eligible to retire, the State Teachers Retirement Board ("STRB") refunded Mr. Horvath only $4,540.51—the sum of her contributions, with no interest. Accordingly, Mr. Horvath calculates that R.C. 3307.651(2) and (3) work to deny him interest in the amount of $29,435.55 accrued on his wife's contributions after August 31, 1959.

{¶ 2} Throughout these proceedings, Horvath has urged invalidation of R.C. 3307.651(2) and (3) on grounds that those provisions (1) effect an unconstitutional taking under the Ohio and United States Constitutions, (2) deny equal protection under the Ohio and United States Constitutions, (3) violate the Contract Clauses of the Ohio and United States Constitutions, and (4) impose contract provisions that are unfair and unconscionable. In response, appellee, STRB, has refuted Horvath's challenges and asserted affirmative defenses of equitable estoppel, waiver, and laches. In the proceedings below, the common pleas and appellate courts upheld the statutory provisions against Horvath's attacks. The cause is now before this court pursuant to the allowance of a discretionary appeal.

————————————

*Theodore J. Horvath*, *pro se; Chattman, Gaines & Stern Co., L.P.A., Thomas C. Wagner* and *Sara J. Moore*, for appellant.

*Betty D. Montgomery,* Attorney General, *Michael W. Gleespen* and *Kelly Igoe*, Assistant Attorneys General*,* for appellee.

————————————

**COOK, J.**

{¶ **3**} For the reasons stated below, we reject Horvath's challenges to R.C. 3307.651 and determine that he is not entitled to post-1959 interest on his wife's contributions.

## I. R.C. 3307.651(3)

{¶ **4**} From the inception of this action, Horvath's arguments have lumped together R.C. 3307.651(2) and 3307.651(3) and referred to them collectively as the "no interest" statute. In this appeal, Horvath continues to assert that we should invalidate both statutory divisions. Scrutiny of Horvath's claims, however, reveals that only R.C. 3307.651(2) is truly at issue in this case.

{¶ **5**} R.C. 3307.651(2) delays crediting of interest on STRS members' accumulated contributions until retirement. R.C. 3307.651(3) applies to retirees and provides that interest is credited to the retiree's account only if the amount of the account at retirement is a factor in determining a retirement allowance. Because Horvath's claim involves only the right of a beneficiary to a refund of interest earned on a member's accumulated contributions under former R.C. 3307.48(B) when the member dies before becoming eligible to retire, R.C. 3307.651(3) is never placed in issue. Accordingly, the remainder of this opinion analyzes only Horvath's arguments with respect to R.C. 3307.651(2).

## II. TAKINGS

{¶ **6**} Horvath argues that R.C. 3307.651(2) results in an unconstitutional taking of private property in violation of the Fifth Amendment to the United States Constitution and Section 19, Article I of the Ohio Constitution. Horvath likens STRB's retention of the interest accrued on his wife's mandatory STRS contributions to the "physical occupation of property" analyzed by the United States Supreme Court in *Loretto v. Teleprompter Manhattan CATV Corp.* (1982), 458 U.S. 419, 434, 102 S.Ct. 3164, 3175, 73 L.Ed.2d 868, 882. Accordingly, Horvath cites *Penn Cent. Transp. Co. v. New York* (1978), 438 U.S. 104, 124, 98

S.Ct. 2646, 2659, 57 L.Ed.2d 631, 648, in urging that "it is inappropriate and unnecessary to examine the character or purpose of [R.C. 3307.651(2)] or its benefit to the public, economic impact on a teacher or interference with her reasonable investment expectations or whether it fairly adjusts 'the benefits and burdens of economic life to promote the common good.' "

{¶ 7} A review of the Supreme Court's takings jurisprudence, however, demonstrates that the very factors Horvath wishes this court to ignore are those with the most relevance to his case. *Loretto* is quite dissimilar to this case. *Loretto* involved a *permanent physical occupation of real property*; state legislation permitted cable television carriers to permanently affix access lines and other facilities to apartment buildings and severely limited the landlords' recompense for the intrusion. *Id.*, 458 U.S. at 422-425, 102 S.Ct. at 3168-3170, 73 L.Ed.2d at 873-875. Because governmental action involving permanent physical occupation of real property is of such a character as to itself carry the traditional takings inquiry, the *Loretto* court held that there was no reason to further analyze the public benefit of the governmental action or its impact on the property owner. *Id*. at 434-438, 102 S.Ct. at 3175-3177, 73 L.Ed.2d at 881-884. As we discuss below, the most important distinctions between *Loretto* and this case are that (1) the governmental action in this case is not a physical occupation of private property for its own use, and (2) ultimately, Mrs. Horvath possessed no property right to interest on her STRS contributions.

{¶ 8} At the outset, we think it necessary to announce the common purpose behind the United States and Ohio Takings Clauses. Those constitutional guarantees are " 'designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " *Penn Cent. Transp. Co. v. New York*, 438 U.S. at 123, 98 S.Ct. at 2659, 57 L.Ed.2d at 648, quoting *Armstrong v. United States* (1960), 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554, 1561. In conjunction with this design,

"[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, see, *e.g., United States v. Causby,* 328 U.S. 256 [66 S.Ct. 1062, 90 L.Ed. 1206] (1946), than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent.,* 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648.

{¶ 9} On this issue, we draw comparison to *Connolly v. Pension Benefit Guar. Corp.* (1986), 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166. In *Connolly*, the United States Supreme Court reasoned that legislation forcing an employer to fund its share of obligations incurred during voluntary association with a multiemployer pension plan did not constitute a taking. In addressing the nature of the government action, the court noted that "the Government does not physically invade or permanently appropriate any of the employer's assets for its own use. Instead, the Act safeguards the participants in multiemployer pension plans by requiring a withdrawing employer to fund its share of the plan obligations incurred during its association with the plan. This interference with the property rights of an employer arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and, under our cases, does not constitute a taking requiring Government compensation." *Id.* at 225, 106 S.Ct. at 1026, 89 L.Ed.2d at 179.

{¶ 10} Similarly, in this case, Mrs. Horvath's contributions to the STRS were used to benefit STRS participants—a subset of the public that included her. As we discuss later, STRS itself adjusts the benefits and burdens of providing public school teachers with retirement, death, and disability benefits among public school teachers and their employers. While the state may derive an indirect benefit from this use in that the STRS benefits publicly employed school teachers, that indirect benefit does not equate with physical invasion or permanent appropriation of the assets of fund participants for its own use. Accordingly, the analysis

employed in *Loretto*, involving a permanent physical occupation of real property, is inapposite to this case.

{¶ 11} Having rejected Horvath's attempt to analogize this case to *Loretto,* we now turn to the traditional takings inquiry set forth by the court in *Penn Cent.* Although the *Penn Cent.* court noted that the traditional takings inquiry requires an *ad hoc* analysis depending largely on the circumstances of a particular case, it listed the following factors as having particular significance: (1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action. *Id.*, 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648. We previously analyzed the character of governmental action in this matter as being similar to the economic legislation considered in *Connolly* and dissimilar to the physical invasion considered in *Loretto*, and now confirm that our analysis of that issue weighs against the finding of a taking. Accordingly, we proceed to analyze the economic impact of the regulation on Mrs. Horvath and her investment-backed expectations in her STRS contributions.

{¶ 12} In analyzing the severity of the economic impact of R.C. 3307.651(2), we cannot discount, as does Horvath, the benefits that he and his wife could have received under the STRS had certain events occurred. See *Connolly*, 475 U.S. at 225-226, 106 S.Ct. at 1026-1027, 89 L.Ed.2d at 179-180. Instead, potential benefits unrealized by the Horvaths are nevertheless to be considered as offsetting the STRS's ultimate adverse economic impact on the Horvaths. For instance, had Mrs. Horvath lived to retirement age, she would have drawn a pension, based on her contributions or her final average salary or a minimum amount far exceeding her total contributions and accumulated interest. See former R.C. 3307.38(B) and (C) (providing alternative methods of calculating service retirement benefits), 143 Ohio Laws, Part III, 4124-4125. Moreover, STRS funded various benefits that either applied to Mrs. Horvath during her service as a public

school teacher or that would become available to her upon retirement. See, *e.g.*, G.C. 7896-38 (disability benefits) and 7896-41a(b) (survivor benefits), 124 Ohio Laws 643 and 647; the versions of R.C. 3307.43 (disability benefits) and 3307.49(B) (survivor benefits) in effect during Mrs. Horvath's period of service, *e.g.*, 127 Ohio Laws 326 and 330; and the versions of R.C. 3307.38 (service retirement benefits), 143 Ohio Laws, Part III, 4124, R.C. 3307.40 (lump sum payment upon death), 143 Ohio Laws, Part III, 4125, R.C. 3307.405 (Medicare equivalent benefits), 136 Ohio Laws, Part I, 1281, and R.C. 3307.49(A) (survivor benefits), 142 Ohio Laws, Part I, 1186, in effect on January 31, 1990—the date that Mrs. Horvath would have become eligible for retirement. Finally, in this case, any adverse economic impact is minimized by the option available to Mrs. Horvath when she left teaching to withdraw her contributions and invest that money on her own, and the ultimate refunding of Mrs. Horvath's base contributions upon her death. R.C. 3307.46 (all versions); former R.C. 3307.48(B), 136 Ohio Laws, Part II, 2193 (in effect at the time of Mrs. Horvath's death).

{¶ 13} In Mrs. Horvath's case, failure to reach retirement age caused her potential STRS benefits to remain unrealized. Nevertheless, Mrs. Horvath's forfeiture of the interest earned on her contributions is not disproportionate to the benefits available to her under the plan, whether actually realized or not. Thus, the second takings factor of the *Penn Cent.* test is not in Horvath's favor. Compare *Connolly*.

{¶ 14} Finally, in considering the Horvaths' reasonable investment-backed expectations, we note that, from R.C. 3307.651's effective date in November 1965 to R.C. 3307.80's effective date in March 1997,[1] teachers who did not meet the

---

1. In 1996, the General Assembly enacted R.C. 3307.80, effective March 31, 1997, as part of Am.Sub.H.B. No. 586, mandating payment of interest on members' accumulated contributions in the event of death or withdrawal from the system before vesting. Appellant does not argue that R.C. 3307.80 applies to his situation, nor does this appeal involve a claim regarding disparate treatment of those who receive the benefit of R.C. 3307.80 and those who do not.

eligibility requirements for retirement were not entitled to interest on their contributions. Nevertheless, it is for substantially this same period of time that Horvath argues interest should have accrued and been credited to his wife's account. Accordingly, the Horvaths' expectations of receiving interest on STRS contributions did not reasonably continue after R.C. 3307.651 became effective.

{¶ 15} Moreover, courts construing the investment-backed expectation factor of the *Penn Cent.* triad have concluded that its purpose is "to limit recovery to owners 'who could demonstrate that they bought their property in reliance on a state of affairs *that did not include the challenged regulatory regime*.' " (Emphasis added.) *Allen v. Cuomo* (C.A.2, 1996), 100 F.3d 253, 262, quoting *Loveladies Harbor, Inc. v. United States* (Fed.Cir.1994), 28 F.3d 1171, 1177. This conclusion seems grounded in the long-standing principle that "[n]o person has a vested interest in any rule of law entitling him to insist that it shall remain unchanged for his benefit." *New York Cent. RR. Co. v. White* (1917), 243 U.S. 188, 198, 37 S.Ct. 247, 250, 61 L.Ed. 667, 672. As noted by one legal commentator, and cited with approval by the United States Supreme Court in *Landgraf v. USI Film Prods.* (1994), 511 U.S. 244, 270, 114 S.Ct. 1483, 1499, 128 L.Ed.2d 229, 255, fn. 24, "[i]f every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever." Fuller, The Morality of Law (1964) 60. See, also, *Branch v. United States* (Fed.Cir.1995), 69 F.3d 1571, 1578. Because the record contains no indication that the Horvaths possessed a reasonable investment-backed expectation to interest on STRS contributions made after August 1959, this factor also weighs against finding a taking.

{¶ 16} Having failed the *Penn Cent.* takings analysis, Horvath's claim is not saved by his analogy to *Webb's Fabulous Pharmacies, Inc. v. Beckwith* (1980), 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358. Unlike our previous takings discussion, which treated Mrs. Horvath's mandatory contributions and the interest accrued

8

thereon as a single, indivisible unit (see *Phillips v. Washington Legal Found.* [1998], 524 U.S. ___, ___, 118 S.Ct. 1925, 1937-1939, 141 L.Ed.2d 174, 193-196 [Breyer, J., dissenting]), Horvath's argument under *Webb's* focuses solely on his wife's property right to earned interest as an incident of ownership of the account set up in her name pursuant to R.C. 3307.19. While Horvath's argument supposes a constitutional property right to interest earned on the STRS contributions, *Webb's* makes it clear that any property right to interest on contributions would have to be a product of some source independent of the federal Constitution, such as state law. " '[P]roperty interests ... are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law ....' *Board of Regents v. Roth*, 408 U.S. 564, 577 [92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561] (1972). But a mere unilateral expectation or an abstract need is not a property interest entitled to protection." *Webb's,* 449 U.S. at 161, 101 S.Ct. at 451, 66 L.Ed.2d at 364.

{¶ 17} The teacher's savings fund of the STRS is much different from the interpleader fund considered in *Webb's*. The interpleader fund at issue in *Webb's* was private property held for the ultimate benefit of Webb's creditors. To that fund, the court applied the "usual and general rule * * * that any interest on an interpleaded and deposited fund follows the principal and is to be allocated to those who are ultimately to be the owners of the principal." *Webb's*, 449 U.S. at 162, 101 S.Ct. at 451, 66 L.Ed.2d at 365. The *Webb's* court rejected the suggestion that sums placed in the interpleader fund became "public money" upon deposit until they left the account, instead stressing that sums placed in the interpleader fund remained private property, despite the fact that creditors lacked an immediate right to its proceeds. See, also, *Phillips*, 524 U.S. at ___, 118 S.Ct. at 1930, 141 L.Ed.2d at 183-184 (noting that all the parties to that appeal agreed that the principal held in IOLTA trust accounts is the client's "private property"). Additionally, the *Webb's* court was careful to note that the statute at issue was not one adjusting " 'the

benefits and burdens of economic life to promote the common good.' " *Webb's*, 449 U.S. at 163, 101 S.Ct. at 452, 66 L.Ed.2d at 366, quoting *Penn Cent.*, 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648.

{¶ 18} In contrast to the interpleader fund in *Webb's*, mandatory teacher contributions to the STRS result from economic legislation designed to benefit retired and disabled public school teachers and their survivors and beneficiaries[2] and, when placed in the fund, lose their character as private property. See R.C. 3307.03. Grants made from STRS funds, including refunds drawn from the teachers' savings fund pursuant to R.C. 3307.48(B) and 3307.46, constitute statutory benefits. See *Kodish v. Pub. Emp. Retirement Bd.* (1975), 45 Ohio App.2d 147, 153, 74 O.O.2d 167, 170-171, 341 N.E.2d 320, 324. Accordingly, the nature and extent of a contributor's protected property rights in the STRS are determined solely by the statutes that govern the system. See *Crown v. Patrolmen's Variable Supplements Fund Trustees* (S.D.N.Y.1987), 659 F.Supp. 318, 320, affirmed (C.A.2, 1987), 819 F.2d 47.

{¶ 19} Granted, funds held in the teachers' savings fund superficially resemble personal annuities in that R.C. 3307.19 requires the STRB to maintain separate accounts for each contributing teacher, showing both the teacher's contribution and interest accumulated thereon. The overall STRS scheme, however, requires these records to be kept only for purposes of calculating the benefits defined in R.C. Chapter 3307 that are granted upon retirement, death, disability, or voluntary withdrawal upon cessation of teaching.

---

2. Economic legislation related to the welfare of employees, including pension funds for public employees, is granted favored status under Section 34, Article II of the Ohio Constitution, which states: "Laws may be passed fixing and regulating the hours of labor, establishing a minimum wage, and providing for the comfort, health, safety and general welfare of all employes; and no other provision of the constitution shall impair or limit this power." Pursuant to this provision, our court has upheld the creation, administration, management and control of public pension funds against wide-ranging constitutional attacks. See *State ex rel. Bd. of Trustees of Police & Firemen's Pension Fund v. Bd. of Trustees of Police Relief & Pension Fund* (1967), 12 Ohio St.2d 105, 41 O.O.2d 410, 233 N.E.2d 135.

{¶ 20} R.C. 3307.651(2) and 3307.711 combine to credit interest on contributors' accounts upon retirement in order to calculate the retiree's retirement allowance, annuity, or pension. Former R.C. 3307.48(B) created a statutory right in favor of Mr. Horvath to have his wife's contributions refunded to him upon her death. By operation of R.C. 3307.651(2), however, that right did not include interest accrued on Mrs. Horvath's contributions. Because neither Mrs. Horvath as a member of STRS nor Mr. Horvath as her beneficiary ever possessed a vested property right to interest accrued on her STRS contributions, there was no taking under our state or federal Constitutions.

### III. EQUAL PROTECTION

{¶ 21} Horvath proposes that the unequal treatment by R.C. 3307.651(2) of teachers who retire and those who do not violates the Equal Protection Clauses of the United States and Ohio Constitutions. Horvath does not argue the presence of a suspect class or fundamental right, but simply argues that there is no rational basis supporting the disparate treatment of retirees and nonretirees. We disagree.

{¶ 22} As stated in *State ex rel. Nyitray v. Indus. Comm.* (1983), 2 Ohio St.3d 173, 175, 2 OBR 715, 717, 443 N.E.2d 962, 964, "[e]qual protection of the laws requires the existence of reasonable grounds for making a distinction between those within and those outside a designated class. The 'reasonableness' of a statutory classification is dependent upon the purpose of the Act." (Citations omitted.) The makeup of the classes identified by Horvath is itself telling. Eligibility for retirement is based on an aggregate of two factors: age and service time. Accordingly, classification of members into groups of retirees and nonretirees furthers the apparent purpose of STRS of protecting elderly and long-serving public school teachers with adequate retirement benefits.

{¶ 23} Because the statutes set apart retirees as a class that STRS is chiefly designed to benefit, it logically follows that nonretirees will not be entitled to the same treatment. When the legislature moved STRS from a defined-contribution

plan toward a defined-benefit plan, the nature of the system changed to guarantee benefit levels upon retirement—shifting the investment risk away from the individual contributor.[3] In order to help fund guaranteed benefit levels, the legislature opted to reduce the benefits of those who fail to qualify for retirement by refunding to the contributor or beneficiary only accumulated contributions, without crediting interest on those contributions. Former R.C. 3307.46, former R.C. 3307.48, and R.C. 3307.651.

{¶ 24} "[L]egislation may impose special burdens upon defined classes in order to achieve permissible ends. But the Equal Protection Clause does require that, in defining a class subject to legislation, the distinctions that are drawn have 'some relevance to the purpose for which the classification is made.' " *Rinaldi v. Yeager* (1966), 384 U.S. 305, 309, 86 S.Ct. 1497, 1499-1500, 16 L.Ed.2d 577, 580, quoting *Baxstrom v. Herold* (1966), 383 U.S. 107, 111, 86 S.Ct. 760, 763, 15 L.Ed.2d 620, 624. Classifications having a reasonable basis do "not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' " *Dandridge v. Williams* (1970), 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed. 491, 501-502, quoting *Lindsley v. Natural Carbonic Gas Co.* (1911), 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369, 377. Because a rational basis underlies disparate treatment of public school teachers who meet retirement eligibility and those who do not, there is no equal protection violation.

## IV. CONTRACT CLAIMS

### A. Contract Clauses

---

3. The 1951 amendment effected by Am.Sub.S.B. No. 96, 124 Ohio Laws 640, added a minimum benefit limited by the final average salary to G.C. 7896-35, and the 1965 amendment to R.C. 3307.38 enacted in Am.Sub.H.B. No. 225, 131 Ohio Laws 712, allows retirees to receive the greater benefits calculated under alternative formulas: one based primarily on service credit and the member's final average salary, the other based primarily on the member's accumulated contributions.

**{¶ 25}** Next, Horvath argues that R.C. 3307.651(2) creates an unconstitutional impairment of contract in violation of Clause 1, Section 10, Article I of the United States Constitution and Section 28, Article II of the Ohio Constitution. Again, we disagree.

**{¶ 26}** Essentially, Horvath argues that, at the time Mrs. Horvath started working, the STRS created a contractual obligation to pay interest on her STRS contributions that could not later constitutionally be altered by statute. In analyzing whether a statute violates the Contract Clause, "[g]enerally, we first ask whether the change in state law has 'operated as a substantial impairment of a contractual relationship.' " *Gen. Motors Corp. v. Romein* (1992), 503 U.S. 181, 186, 112 S.Ct. 1105, 1109, 117 L.Ed.2d 328, 337, quoting *Allied Structural Steel Co. v. Spannaus* (1978), 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727, 736. "This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *Romein*, 503 U.S. at 186, 112 S.Ct. at 1109, 117 L.Ed.2d at 336.

**{¶ 27}** In determining whether a contractual relationship exists in the first instance, we are mindful that a state legislative enactment may be deemed a contract for purposes of the Contract Clause only if there is a clear indication that the legislature has intended to bind itself in a contractual manner. *Natl. RR. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.* (1985), 470 U.S. 451, 465-466, 105 S.Ct. 1441, 1451, 84 L.Ed.2d 432, 445-446. Accordingly, we begin with a presumption that, absent a clearly stated intent to do so, statutes do not create contractual rights that bind future legislatures. *Id.* Courts have coined the phrase "unmistakability doctrine" for this legal principle. See, *e.g., McGrath v. Rhode Island Retirement Bd.* (C.A.1, 1996), 88 F.3d 12, 19, citing *United States v. Winstar Corp.* (1996), 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964. The requirement inherent in the unmistakability doctrine that " 'the government's obligation unmistakably appear thus serve[s] the dual purposes of limiting contractual

13

incursions on a State's sovereign powers and of avoiding difficult constitutional questions about the extent of state authority to limit the subsequent exercise of legislative power.' " *Parker v. Wakelin* (C.A.1, 1997)*, 123 F.3d 1, 5, quoting *United States v. Winstar Corp.*, 518 U.S. at 875, 116 S.Ct. at 2455, 135 L.Ed.2d at 991. The unmistakability doctrine is useful not only in determining whether a contractual relationship exists, but also in "defining the contours" of any contractual obligation that is found to exist. *Atchison*, 470 U.S. at 466, 105 S.Ct. at 1452, 84 L.Ed.2d at 446.

{¶ 28} Our early cases categorized pensions granted to public servants as mere gratuities, which were not to be equated with contractual rights. Accordingly, pension boards were free to modify pension awards, provided that modifications were done reasonably and not arbitrarily. *Mell v. State ex rel. Fritz* (1935), 130 Ohio St. 306, 309, 4 O.O. 320, 321-322, 199 N.E. 72, 73. In *State ex rel. Cunat v. Trustees of Cleveland Police Relief & Pension Fund* (1948), 149 Ohio St. 477, 481-482, 37 O.O. 143, 145, 79 N.E.2d 316, 318, however, the court acknowledged that enactment of the "vested right" statutes placed pensions granted to public servants covered by a firemen's pension fund or a police relief fund in the category of unilateral contracts that, *upon conditions fulfilled*, ripen into a contractual right to a pension.

{¶ 29} In 1955, the legislature added vesting language to the STRS similar to that contained in the vested rights statutes considered in *Cunat* by enacting R.C. 3307.711 as part of Am.H.B. No. 744, 126 Ohio Laws 1047. By its terms, R.C. 3307.711 vests a right to a retirement allowance, annuity, or pension *at the time that benefit is granted by the STRB* at the rate fixed by law when the benefit is conferred. Accordingly, under R.C. 3307.711, a right does not become vested until it is granted, and only grants of retirement allowances, annuities, and pensions give rise to vested rights. R.C. 3307.711 does not reach refunds of accumulated contributions under R.C. 3307.48(B) or R.C. 3307.46.

**{¶ 30}** Outside of R.C. 3307.711, there is nothing in any version of the Act evincing an intent on the part of the General Assembly to bind itself contractually to STRS participants.[4] Moreover, there is nothing in the language of any of our statutes or our state Constitution creating a vested or contractual right to defined STRS benefit levels upon commencement of public employment, or barring legislative modification of benefits prior to vesting under R.C. 3307.711.[5]

**{¶ 31}** We recognize that other states have found the deferred-compensation aspect of a public pension to implicitly require vesting of the right to a pension at fixed and definite benefit levels upon acceptance of employment. See, *e.g., Betts v. Bd. of Administration of Pub. Employees' Retirement Sys.* (1978), 21 Cal.3d 859, 863, 148 Cal.Rptr. 158, 161, 582 P.2d 614, 617; *Sylvestre v. Minnesota* (1973), 298 Minn. 142, 155-156, 214 N.W.2d 658, 666-667; *Yeazell v. Copins* (1965), 98 Ariz. 109, 402 P.2d 541. Applying the unmistakability doctrine, however, we are unable to conclude that our legislature intended to confer contractual rights upon STRS participants aside from those that have vested by operation of statute. Compare *Spiller v. Maine* (Me.1993), 627 A.2d 513, 515-517

---

4. Horvath cites R.C. 3307.58 in arguing that a teacher has contract rights in the STRS. That section provides:

"Each employer, before employing any teacher to whom sections 3307.01 to 3307.72, inclusive, of the Revised Code, applies, shall notify such person of his duties and obligations under such sections as a condition of his employment.

"Any such appointment or reappointment of any teacher in the public day schools of the state, or service upon indefinite tenure, shall be conditioned upon the teacher's acceptance of such sections, as part of the contract."

That section, however, incorporates only the *duties and obligations* that R.C. Chapter 3307 imposes upon public school teachers into the teachers' individual employment contracts. It does not unmistakably bring the entire STRS scheme within the employment contract.

5. A number of states have provisions in either their constitutions or statutes vesting public employees with their pensions upon commencement of their employment and barring legislative modifications that retroactively reduce public employees' accrued benefits. *Parker*, 123 F.3d at 7 (listing Alaska Constitution, Section 7, Article XII; Hawaii Constitution, Section 2, Article XVI; Illinois Constitution, Section 5, Article XIII; Michigan Constitution, Section 24, Article IX; New York Constitution, Section 7, Article V; *Opinion of the Justices* [1973], 364 Mass. 847, 860, 303 N.E.2d 320, 327).

(statutes establishing pension benefits for state employees did not create contractual rights, and, thus, legislative modifications of prospective retirement benefits for state employees did not violate state and federal Contract Clauses); *Pineman v. Oechslin* (1985), 195 Conn. 405, 414, 488 A.2d 803, 808 (retirement Act did not create vested contractual rights in favor of state employees before they became eligible for pensions, since there was no clear expression by legislature that the Act was intended to create such rights). Accordingly, consistent with our earlier opinions on the subject, we conclude that public school teachers do not possess contract rights in any STRS benefit unless and until the benefit vests by operation of R.C. 3307.711. See *Petras v. State Bd. of Pension Trustees* (Del.1983), 464 A.2d 894, 896. We therefore hold that R.C. 3307.651(2) does not violate our state or federal Contract Clauses.

### B. Conscionability

{¶ 32} Horvath seeks to avoid application of R.C. 3307.651(2) by arguing that it is an unconscionable or unfair adhesion contract provision and therefore should be voided. In our previous discussion, we established that a contractual relationship between Mrs. Horvath and the state regarding the STRS never came into being, and further that any contractual rights or obligations that could arise out of R.C. 3307.711 would not extend to the right to a refund of a STRS participant's accumulated contributions under R.C. 3307.48(B), R.C. 3307.46, or any of those provisions' predecessors. Accordingly, there is no need to further analyze R.C. Chapter 3307 as a contract or its individual provisions as contract terms.

### V. CONCLUSION

{¶ 33} Because Horvath fails to demonstrate that R.C. 3307.651(2) suffers a constitutional infirmity or constitutes an unconscionable or unfair adhesion contract term, we affirm the judgment of the court of appeals.

*Judgment affirmed.*

MOYER, C.J., RESNICK, F.E. SWEENEY and LUNDBERG STRATTON, JJ., concur.

DOUGLAS, J., concurs in judgment only.

PFEIFER, J., dissents.

_____