LITVA et al., Appellants and Cross–Appellees,

v.

VILLAGE OF RICHMOND, Appellee and Cross–Appellant.

[Cite as *Litva v. Richmond,* 172 Ohio App.3d 349, 2007-Ohio-3499.]

Court of Appeals of Ohio,
Seventh District, Jefferson County.

No. 05–JE–26.

Decided June 29, 2007.

350

Milton A. Hayman, for appellants and cross-appellees.

Christopher D. Becker, for appellee and cross-appellant.

DONOFRIO, Judge.

{¶ 1} Plaintiffs-appellants and cross-appellees, Ronald Swiger, Mildred Rowland, and John and Theresa Litva, appeal from a Jefferson County Common Pleas Court decision granting summary judgment in favor of defendant-appellee and cross-appellant, the village of Richmond. The court held that disputed village ordinances are "valid and enforceable."

{¶ 2} Appellants own property in Richmond, Ohio. The Litvas keep horses on their property for breeding, training, and giving riding lessons. Swiger and Rowland raise donkeys, goats, and chickens on their property and use the animals as attractions for their antique shop. When appellants purchased the land, there were no laws or regulations prohibiting property owners from keeping farm animals on their property.

{¶ 3} Subsequently, a group of citizens in favor of the prohibition of farm animals in the village placed a proposed ordinance on the ballot through an initiative petition. The voters passed the initiative petition on November 6, 2001, Ordinance No. 626, which prohibits "the keeping, harboring, fencing, penning, pasturing, or stabling of * * * fowl and farm or domesticated animals."

{¶ 4} Richmond Village Council ("Council") then passed Ordinance No. 505.15 as an enforcement mechanism for Ordinance No. 626. Ordinance No. 505.15

permits those who already own farm animals to keep farm animals and requires them to register the animals with the village.

{¶ 5} Appellants filed a complaint asking for damages and a declaration and judicial determination of rights and duties with respect to the enforcement of Ordinance Nos. 626 and 505.15. Appellants claimed that the recently passed legislation caused their farm animal businesses to suffer loss of income in the raising, maintaining, cultivating, breeding, and boarding of their animals.

{¶ 6} Appellants and appellee each filed summary judgment motions. The trial court granted summary judgment in favor of appellee, finding that the ordinances are valid and enforceable, and appellants are "permitted to maintain there [sic] non-conforming use in the manner and to the extent it existed on the effective day" of the passage of the Ordinances. In other words, appellants "may continue to possess the same number of animals possessed on the effective date of the Ordinances but this right is not limited to the identical animals that were owned at the time." Appellants filed a timely notice of appeal on June 30, 2005.

{¶ 7} Appellants raise two assignments of error, the first of which states:

{¶ 8} "The court erred in granting defendant's motion for summary judgment without a hearing."

{¶ 9} Appellants contend that the trial court erred in granting summary judgment without a hearing, because they could have presented material evidence in support of their case through testimony and documents.

{¶ 10} Civ.R. 56(C) states that courts are to consider only "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact" when ruling on summary judgment motions. Therefore, Civ.R. 56(C) does not allow for testimony to be presented in a summary judgment hearing.

{¶ 11} Further, Ohio appellate courts "uniformly agree that a trial court is not required to schedule an oral hearing on every motion for summary judgment." *Hooten v. Safe Auto Ins. Co.,* 100 Ohio St.3d 8, 2003-Ohio-4829, 795 N.E.2d 648, at ¶ 14. The trial court has discretion in deciding whether to grant a request for an oral hearing. Id. Here, there is no indication that appellants requested an oral hearing. Thus, even if appellants did request an oral hearing, it would not be mandatory for the trial court to hold one. Therefore, we cannot conclude that the trial court abused its discretion in granting summary judgment without a hearing.

{¶ 12} Accordingly, appellants' first assignment of error is without merit.

{¶ 13} Appellants' second assignment of error states:

{¶ 14} "The court erred in allowing the village of Richmond to take plaintiffs' property rights without just compensation."

{¶ 15} Appellants now argue that by "drastically" restricting the uses of their property without compensation, their land has become less valuable. They contend that the ordinances constitute a taking as prohibited by the Fifth Amendment to the United States Constitution. However, they never made this argument in their summary judgment motion. Appellants' summary judgment argument focused on whether the ordinances were properly passed and whether their enforcement was a valid exercise of police power by appellee. Irrespective, these ordinances did not result in the taking of appellants' property in that they were not prohibited from using their property as they had in the past.

{¶ 16} Both Section 19, Article I of the Ohio Constitution and the Fourteenth and Fifth Amendments to the United States Constitution prohibit the government from taking private property for public use without just compensation. *Palazzolo v. Rhode Island* (2001), 533 U.S. 606, 617, 121 S.Ct. 2448, 150 L.Ed.2d 592; *State ex rel. R.T.G., Inc. v. State*, 98 Ohio St.3d 1, 2002-Ohio-6716, 780 N.E.2d 998, ¶ 33. "The clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use." *Palazzolo*, 533 U.S. at 617, 121 S.Ct. 2448, 150 L.Ed.2d 592. However, this is not the only type of taking. For instance, governmental regulation of property can sometimes constitute a taking. See *Pennsylvania Coal Co. v. Mahon* (1922), 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 ("[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking").

{¶ 17} Furthermore, Section 3, Article XVIII of the Ohio Constitution grants Ohio municipalities the power to enact local police regulations. "A legislative body may enact legislation declaring that previously lawful activity will thereafter be deemed a nuisance. Such legislation will be upheld against constitutional challenge if it comes within the police power, i.e., if it has a real and substantial relation to the public health, safety, morals or general welfare of the public and is neither unreasonable nor arbitrary." *Downing v. Cook* (1982), 69 Ohio St.2d 149, 150, 23 O.O.3d 186, 431 N.E.2d 995, 997. The appellant must demonstrate a "clear and palpable abuse of power" for a reviewing court to substitute its judgment for legislative discretion. *State v. Renalist, Inc.* (1978), 56 Ohio St.2d 276, 278, 10 O.O.3d 408, 383 N.E.2d 892.

{¶ 18} Here, appellants contend that their properties have effectively been "taken" because the ordinances have diminished their property values. But as noted above, appellants did not make this argument to the trial court when they moved for summary judgment. Appellate courts will not consider arguments that parties raise or for the first time on appeal. *Nasser ex rel. Nasser v.*

*Orthopaedic Assn. of Youngstown,* 7th Dist. No. 01–CA–123, 2002-Ohio-5208, 2002 WL 31172981, at ¶ 27. "Despite the fact that appellate courts review summary judgment decisions de novo, '[t]he parties are not given a second chance to raise arguments that they should have raised below.' " *Aubin v. Metzger,* 3d Dist. No. 1–03–08, 2003-Ohio-5130, 2003 WL 22229400, at ¶ 10, quoting *Smith v. Capriolo* (Apr. 11, 2001), 9th Dist. No. 19993, 2001 WL 358387. Accordingly, an appellate court must limit its review of a summary judgment to that which was on record before the trial court. Id.

{¶ 19} Furthermore, appellants have not offered any evidence that the legislation was unreasonable, arbitrary, or unrelated to the general safety and welfare of the public. Also, there was no evidence of a taking because a taking did not occur. The electorate themselves made the determination that farm animals were not wanted in the village, presumably for health and safety reasons. The residents of the village of Richmond decided that it was reasonable and in the best interests of the community to restrict farm animals. There was no evidence that this was an abuse of police powers.

{¶ 20} Appellants have also not offered any evidence demonstrating that Council clearly and palpably abused its police power when it enacted Ordinance No. 505.15 to enforce Ordinance No. 626. Council passed Ordinance No. 505.15 as an enforcement mechanism and as a way to allow prior farm-animal owners to maintain ownership of farm animals. This was not an abuse of power by Council, but rather an attempt by Council to enforce the wishes of the residents of Richmond. It was also an indication that appellants did not suffer a taking.

{¶ 21} But even though the ordinances are valid, the trial court's order puts a further restriction on appellants' property that the ordinances do not. The ordinances simply require appellants to register their animals with the village. The ordinances did not result in any taking of appellants' property. The court's order, however, limits the number of animals appellants may possess on their property.

{¶ 22} Ordinance No. 505.15(a) provides that "[e]very owner * * * of farm or domesticated animals that are currently kept * * * within the current municipal corporation limits shall register the same with the Village." Section (b) goes on to provide that the failure of any owner to register his or her animals by a certain date shall be deemed to be a violation of Ordinance No. 626. Nowhere in Ordinance No. 505.15 or 626 does it provide that animal owners are limited to the same number of animals they possessed on the effective date of the ordinances. The trial court added this restriction. On this basis, appellants' second assignment of error has merit.

{¶ 23} For the reasons stated above, the trial court's judgment is hereby affirmed insofar as it held Ordinance Nos. 626 and 501.15 valid and enforceable. These ordinances did not result in the taking of appellants' property, in that appellants were not prohibited from using their property as they had in the past. The court's judgment is modified, however, and the part of the judgment that limits appellants to the number of animals appellants possessed on the effective date of the ordinances is hereby vacated.

Judgment accordingly.

WAITE, J., concurs.

DEGENARO, J., dissents.

DEGENARO, Judge, dissenting.

{¶ 24} In their complaint, appellants raise both due-process and takings claims. Both the village and the trial court addressed the due-process claim, but neither addressed appellants' takings claim. Accordingly, the trial court's order is not a final, appealable order, and we do not have jurisdiction to hear this case. Because the majority deals with this case on its merits, I must respectfully dissent from its judgment.

{¶ 25} The parties' arguments before this court have confused due-process arguments with takings arguments. When dealing with the merits, the majority continues in the same vein. Furthermore, the majority wrongly concludes that these ordinances cannot be a taking because the citizens directly approved of the law through the power of initiative. Legislation enacted by initiative is on the same constitutional footing as legislation enacted by a legislature. If we were to deal with appellants' takings claims on their merits, we should reverse the trial court's decision and remand the case for further proceedings because there is a genuine issue regarding whether a taking took place.

Is There a Taking if the Action is Done Directly by the Electorate?

{¶ 26} The Ohio Constitution has reserved the powers of initiative and referendum to the people of both the state of Ohio and its municipalities. Section 1(f), Article II, Ohio Constitution. The powers of initiative and referendum are limited to questions that are legislative in nature. *State ex rel. DeBrosse v. Cool* (1999), 87 Ohio St.3d 1, 6, 716 N.E.2d 1114. Accordingly, the constitutional limitations on the legislature's power to enact laws "shall be deemed limitations on the power of the people to enact laws." Section 1, Article II, Ohio Constitution. "If this means anything, it means that a law, even approved by a referendum of the people, must conform to the constitutional test." *State ex rel. Doerfler v. Otis* (1918), 98 Ohio St. 83, 105, 120 N.E. 313 (Wanamaker, J. dissenting). Constitutional prohibitions on legislative action reach "any form of

legislative action, including direct action by the people." *Middletown v. Ferguson* (1986), 25 Ohio St.3d 71, 76, 25 OBR 125, 495 N.E.2d 380, citing *Ross v. Oregon* (1913), 227 U.S. 150, 163, 33 S.Ct. 220, 57 L.Ed. 458; see, also, *State ex rel. Smith v. Fremont* (1927), 116 Ohio St. 469, 478–479, 157 N.E. 318 (local initiatives are subject to the same constitutional limitations as other legislative acts). As a Michigan appellate court has said:

{¶ 27} "A referendum is simply another way to create such municipal legislation. The fact that the municipal legislation was arrived at by a referendum vote does not immunize it from an attack on the basis of its constitutionality or reasonableness. The fact that a majority vote can be obtained on a given subject does not grant a municipality the absolute right to do anything it wishes." (Citations omitted.) *Pulte Land Co., L.L.C. v. Alpine Twp.* (Sept. 12, 2006), Mich.App. Nos. 259759 and 261199, 2006 WL 2613450.

{¶ 28} The Ohio Supreme Court has recognized that parties may wish to challenge the constitutionality or legality of the substance of an ordinance passed via initiative, but it requires that these challenges be made after the electorate passes the proposed ordinance. *DeBrosse*, 87 Ohio St.3d at 6, 716 N.E.2d 1114. Both state and federal courts in Ohio have routinely dealt with challenges to the constitutionality of a particular initiative or referendum passed by a majority of voters. For example, courts have held that initiatives and referenda passed by the voters cannot unconstitutionally impair a binding contract. *Middletown*, 25 Ohio St.3d at 76, 25 OBR 125, 495 N.E.2d 380; *State ex rel. Perona v. Arceci* (1998), 129 Ohio App.3d 15, 19, 716 N.E.2d 1181. Likewise, a court can set aside a referendum passed by the voters if the referendum violates the Equal Protection Clause. *Arthur v. Toledo* (C.A.6, 1986), 782 F.2d 565, 574.

{¶ 29} The majority may somehow believe that takings claims are different from other constitutional claims and that these zoning-type measures passed by voters can never result in such a claim, but this is simply not the case. The plain language of both the United States and Ohio Constitutions prohibits the involuntary appropriation of private property for public use without just compensation. The Fifth Amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." Likewise, Section 19, Article I of the Ohio Constitution requires compensation "where private property shall be taken for public use." These clauses share the "common purpose" of ensuring that individuals will not be forced "to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States* (1960), 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554; *State ex rel. Horvath v. State Teachers Retirement Bd.* (1998), 83 Ohio St.3d 67, 70, 697 N.E.2d 644. The Takings Clause "does not prohibit the taking of private property, but instead places a condition on the exercise of that

power." *First English Evangelical Lutheran Church of Glendale v. Los Angeles Cty.* (1987), 482 U.S. 304, 314, 107 S.Ct. 2378, 96 L.Ed.2d 250.

{¶ 30} There is nothing within either the United States or Ohio Constitution that excuses providing compensation for the involuntary appropriation of private property for public use as long as the voters themselves directly decide that the property should be appropriated. The Ohio Supreme Court has recognized this when it addressed whether a referendum passed by the voters resulted in a taking. *State ex rel. Trafalgar Corp. v. Miami Cty. Bd. of Commrs.*, 104 Ohio St.3d 350, 2004-Ohio-6406, 819 N.E.2d 1040. The government's obligation to provide just compensation under the Takings Clause is triggered when an involuntary appropriation of private land for public use occurs; it does not matter who approved the appropriation.

{¶ 31} The majority's conclusion, if true, would mean that people could have their property taken from them without any compensation at all. For example, the voters in a municipality could decide that a judge should be punished for a particularly unpopular opinion. The voters could then vote to confiscate that judge's property in order to establish a park in which would stand a monument designed to vilify the unpopular opinion.

{¶ 32} Such a scenario was put into action recently by people upset with the United States Supreme Court's decision in *Kelo v. New London* (2005), 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439. In that case, the city of New London sought to take property from private property owners in order to give that property to a private developer, so the developer could turn the property into a largely commercial center, which would include a hotel, office space, shopping areas, and new residences. The court reaffirmed the established principle that "the City would no doubt be forbidden from taking petitioners' land for the purpose of conferring a private benefit on a particular private party." Id., 545 U.S. at 477, 125 S.Ct.2661, 162 L.Ed.2d 439. Nevertheless, the court afforded "legislatures broad latitude in determining what public needs justify the use of the takings power." Id. at 483, 125 S.Ct. 2655, 162 L.Ed.2d 439. The court held that the use in this case was a public use, despite the fact that the property was being immediately transferred to a private developer, because the plan was "carefully formulated" to "provide appreciable benefits to the community, including—but by no means limited to—new jobs and increased tax revenue." Id. When reaching this conclusion, the court refused to second-guess the city's considered judgments about both the efficacy of its development plan and what lands it needs to acquire in order to effectuate the project. Id. at 488–490, 125 S.Ct. 2655, 162 L.Ed.2d 439.

{¶ 33} After that decision, a group tried to have the home of Justice David Souter, a justice who was in the *Kelo* majority, taken and turned into a hotel as a

reprisal for his role in the *Kelo* decision. See Lost Liberty Hotel—Wikipedia, the free encyclopedia (April 19, 2007), http://en.wikipedia.org/wiki/Lost_Liberty_ Hotel. Over a year after *Kelo* was decided, the group was actively trying to have a local municipality take the homes of justices who voted in the *Kelo* majority. See Freestar Media, LLC (April 19, 2007), http://www.freestarmedia.com. Ultimately, the group has not, as of yet, convinced an electorate to appropriate the homes of the justices. However, the fact that this group has so far failed to take property in retribution for a judicial decision does not mean that some other group in the future may not be successful in doing so.

{¶ 34} Under such a scenario, the electorate could decide, via initiative, to directly take a judge's home. This action, according to the majority's rationale, would not be a taking. Such a scenario could face anyone or any group (such as, potentially, the appellants in this case) that goes against the popular will if the majority's proposition were true. And while populism is one of the principles informing our system of democratic government, the Ohio and United States Constitutions prevent this kind of direct populist repression of an unpopular individual or minority group. "[T]he power granted to American courts to pronounce on the unconstitutionality of laws still forms one of the most powerful barriers that has ever been raised * * *" to protect against the so called "tyranny of the majority." Alex de Tocqueville, Democracy in America (2002 Ed.) 98, 239.

Taking vs. Due Process

{¶ 35} Although the majority's conclusion that an involuntary appropriation of private property for government use is not a taking if it is accomplished directly by the electorate is incorrect, this is not the sole way in which the majority opinion is contrary to law.

{¶ 36} The majority discusses whether "the legislation was unreasonable, arbitrary, or unrelated to the general safety and welfare of the public" or an abuse of the village's "police power" when discussing whether the ordinances constituted a taking. Opinion at ¶ 18-19. The majority is presumably engaging in this discussion in order to address whether the application of the ordinances to the particular property at issue in this case is constitutionally invalid. In *State ex rel. Shemo v. Mayfield Hts.* (2002), 95 Ohio St.3d 59, 63, 765 N.E.2d 345, the Ohio Supreme Court, relying on United States Supreme Court precedent, stated that a compensable regulatory taking can occur "*either* if the application of the zoning ordinance to the particular property is constitutionally invalid, i.e., it does not substantially advance legitimate state interests, *or* denies the landowner all economically viable use of the land." (Emphasis sic.)

{¶ 37} *Shemo* made it clear that the "substantially advances" test was not the only way to tell whether a particular action was a taking. Id. For instance,

courts have recognized that governmental regulation can act as a taking if that regulation "goes too far." *Pennsylvania Coal Co. v. Mahon* (1922), 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322. In *Lingle v. Chevron U.S.A., Inc.* (2005), 544 U.S. 528, 125 S.Ct. 2074, 161 L.Ed.2d 876, the United States Supreme Court clarified that there are "two categories of regulatory action that generally will be deemed *per se* takings for *Fifth Amendment* purposes. First, where government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation. A second categorical rule applies to regulations that completely deprive an owner of 'all economically beneficial use' of her property." (Emphasis sic. and citations omitted). Id. at 538, 125 S.Ct. 2074, 161 L.Ed.2d 876, quoting *Lucas v. South Carolina Coastal Council* (1992), 505 U.S. 1003, 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798. There is also a third category of regulatory taking, which is governed by *Penn Cent. Transp. Co. v. New York City* (1978), 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631. Under *Penn Cent.*, courts must conduct an ad hoc examination of the following three factors when determining whether a partial regulatory taking occurred: (1) the economic impact on the landowner, (2) the extent the regulation has interfered with reasonable investment-backed expectations, and (3) the character of government action. *Penn Cent.*, 438 U.S. at 124, 98 S.Ct. 2646, 57 L.Ed.2d 631; *State ex rel. Horvath v. State Teachers Retirement Bd.* (1998), 83 Ohio St.3d 67, 71, 697 N.E.2d 644. "The *Penn Central* factors—though each has given rise to vexing subsidiary questions—have served as the principal guidelines for resolving regulatory takings claims that do not fall within the [two categories of per se regulatory takings]." *Lingle*, 544 U.S. at 539, 125 S.Ct. 2074, 161 L.Ed.2d 876. Each of these inquiries "aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." Id.

{¶ 38} Moreover, *Lingle* held that the "substantially advances" test is not a takings test at all. Id. at 540–542, 125 S.Ct. 2074, 161 L.Ed.2d 876. "[T]his formula prescribes an inquiry in the nature of a due process, not a takings, test, and * * * it has no proper place in our takings jurisprudence" because it "reveals nothing about the *magnitude or character of the burden* a particular regulation imposes upon private property rights. Nor does it provide any information about how any regulatory burden is *distributed* among property owners. In consequence, this test does not help to identify those regulations whose effects are functionally comparable to government appropriation or invasion of private property; it is tethered neither to the text of the *Takings Clause* nor to the basic justification for allowing regulatory actions to be challenged under the Clause." (Emphasis sic.) Id.

{¶ 39} The issue of whether the ordinances in question were otherwise lawful has nothing to do with whether they constitute a taking for which appellants should be compensated; instead, this issue deals with whether the ordinances violate due process. Appellants have not argued a due-process claim in this appeal; instead, their argument on appeal deals solely with whether they are owed compensation under the Takings Clause. Thus, we should disregard any argument dealing with whether the ordinance substantially advances legitimate state interests when addressing appellants' takings argument.

Final Appealable Order

{¶ 40} This brings us to the procedural issues presented by the record. It is reasonably clear that appellants pleaded a cause of action seeking a declaration that a taking took place. Ohio is a notice-pleading state. *York v. Ohio State Highway Patrol* (1991), 60 Ohio St.3d 143, 144, 573 N.E.2d 1063. Civ.R. 8(A) requires only that a complaint "contain (1) a short and plain statement of the claim showing that the party is entitled to relief, and (2) a demand for judgment for the relief to which the party claims to be entitled." Under this rule, "a plaintiff is not required to prove his or her case at the pleading stage," and the complaint is sufficient "as long as there is a set of facts, consistent with the plaintiff's complaint, which would allow the plaintiff to recover." *York*, 60 Ohio St.3d at 145, 573 N.E.2d 1063.

{¶ 41} Appellants' complaint states that the ordinances in question prevent them from operating the business they were formerly allowed to operate and that, as a result, they "have suffered great pecuniary loss of income." They sought a declaration "as to their rights" in respect to the ordinances. Under a notice-pleading regimen, this is sufficient to take a claim for a declaration that a taking has occurred.

{¶ 42} It is worthwhile to note that appellants asked for damages as well, but could not receive compensation for the taking in this case. "Mandamus is the appropriate action to compel public authorities to institute appropriation proceedings where an involuntary taking of private property is alleged." *Shemo*, 95 Ohio St.3d at 63, 765 N.E.2d 345.

{¶ 43} Despite the fact that appellants pleaded this takings claim, the village's motion for summary judgment did not ask the trial court to decide this claim. The village's motion was based solely on whether the ordinances were a proper exercise of its police powers, i.e., whether the ordinances had "a real and substantial relation to the public health, safety, morals, or general welfare of the public and is neither unreasonable nor arbitrary." The village argued that the ordinances were not "a clear and palpable abuse of power" and urged the trial court to conclude that the appellants "would be permitted to continue to have farm animals" in a particular number.

{¶ 44} The trial court granted the village precisely the relief it sought. It concluded that the ordinances were "valid and enforceable" and concluded that those ordinances limited appellants to keeping the same number of animals on their property as were kept at the date that the ordinances became effective.

{¶ 45} Our appellate jurisdiction is limited to the review of final orders, judgments, and decrees. Section 3(B)(2), Article IV, Ohio Constitution; R.C. 2505.03. R.C. 2505.02(B)(1) provides that an order is final if it "affects a substantial right in an action that in effect determines the action and prevents a judgment." However, Civ.R. 54(B) states that such an order is not appealable if "more than one claim for relief is presented in an action" and the order only enters "judgment as to one or more but fewer than all of the claims" unless the trial court expressly determines "that there is no just reason for delay." See, also, *Chef Italiano Corp. v. Kent State Univ.* (1989), 44 Ohio St.3d 86, 88, 541 N.E.2d 64 (a final order must comply with Civ.R. 54(B)).

{¶ 46} In this case, it appears fairly clear that the trial court did not grant judgment on appellants' taking claims. Its judgment addresses whether the ordinances are valid and enforceable, an issue that is irrelevant in a takings action. Furthermore, the trial court granted the village exactly the relief it requested in its motion for summary judgment. Accordingly, it appears that appellants' takings claim is still pending before the trial court. Because the trial court did not find that there is no just reason for delay, its judgment is not final and appealable, and we do not have the jurisdiction to review its judgment.

{¶ 47} The majority avoids this conclusion by arguing that appellants have waived their takings arguments by not asking the trial court for summary judgment on those claims. This is an odd conclusion because parties are, after all, entitled to move for partial summary judgment and are not required to argue all of their claims in a motion for summary judgment. I fail to see how a party's failure to seek summary judgment on a claim affects whether we have jurisdiction over a nonfinal, appealable decision addressing that party's other claims.

Merits of Takings Claim

{¶ 48} Finally, even if the trial court had addressed the merits of appellants' takings claim, it acted improperly by denying that claim at this point in the litigation. In a declaratory judgment action, courts determine facts "in the same manner as issues of fact are tried and determined in other civil actions in the court in which the action or proceeding is pending." R.C. 2721.10. Some declaratory judgment actions are decided pursuant to a motion to dismiss under Civ.R. 12(B)(6). See, e.g., *Stacy v. Gains*, 7th Dist. No. 03 MA 193, 2004-Ohio-7213, 2004 WL 3090231. Others are dealt with under Civ.R. 56(B), which allows motions for summary judgment in cases seeking a declaratory judgment. See, e.g., *Am. Mfr. Mut. Ins. Co. v. Kurtz*, 7th Dist. No. 04 MA 53, 2005-Ohio-6452,

2005 WL 3293813. However, declaratory judgment actions must be tried to a court or jury when they cannot be otherwise resolved. *Erie Ins. Group v. Fisher* (1984), 15 Ohio St.3d 380, 381, 15 OBR 497, 474 N.E.2d 320.

{¶ 49} The evidence in the record on this claim demonstrates that there is a genuine issue of material fact regarding whether appellants are owed compensation for a taking.

{¶ 50} Appellants' takings claim is based on neither of the two per se regulatory takings categories. Instead, their claim focuses on whether the ordinances are a regulatory taking under *Penn Cent.* To reiterate, *Penn Cent.* outlines three factors that courts must consider when determining whether a partial regulatory taking occurred: (1) the economic impact on the landowner, (2) the extent the regulation has interfered with reasonable investment-backed expectations, and (3) the character of government action. Id. at 124, 98 S.Ct. 2646, 57 L.Ed.2d 631.

{¶ 51} In its opinion, the majority correctly notes that there is no numerical limit within the ordinance on the animals kept in the village by people who kept animals in the village prior to the ordinances' passage. This could lead to the conclusion that there is no limit on the appellants' ability to keep animals in the village. However, such a conclusion ignores the fact that there is a temporal limit within the ordinances.

{¶ 52} Ordinance No. 626 provides:

{¶ 53} "No person, firm or corporation shall permit the keeping, harboring, fencing, penning, pasturing or stabling of horses, cattle, mules, swine, sheep, goats, donkeys, geese, ducks, chickens and other fowl and farm or domesticated animals with the exception of rabbits, dogs and domesticated cats, within the corporation limits of the Village of Richmond.

{¶ 54} "For the purposes of this Ordinance, the term 'farm or domesticated animal' shall include any and all animals which can or are normally kept or raised for food and/or profit.

{¶ 55} "Whoever violates this Ordinance shall be guilty of a misdemeanor of the fourth degree and shall be punished by a fine of up to two hundred and fifty dollars ($250.00) and/or up to thirty (30) days in jail. Each day a violation of this Ordinance occurs shall be considered a separate offense and may be charged as such. A second violation of this Ordinance by the same person, firm, corporation, or entity shall be a misdemeanor of the third degree and shall be punished by a fine of up to five hundred dollars ($500.00) and/or up to sixty (60) days in jail."

{¶ 56} Ordinance No. 505.15 provides:

{¶ 57} "(a) Every owner, keeper and/or harborer of horses, cattle, mules, swine, sheep, goats, donkeys, geese, ducks, chickens and other fowl and farm or domesticated animals that are currently kept, harbored, fenced, penned, pastured, stabled or otherwise kept within the municipal corporation limits shall register the same with the Village on or before June 15, 2002.

{¶ 58} "(b) Failure of any owner, keeper and/or harborer of horses, cattle, mules, swine, sheep, goats, donkeys, geese, ducks, chickens and other fowl and farm or domesticated animals that are currently kept, harbored, fenced, penned, pastured, stabled or otherwise kept within the municipal corporation limits on or before June 15, 2002, shall be deemed to be in violation of [Ordinance No. 626].

{¶ 59} "(c) No person shall fail to, or falsely or fraudulently register any animal that is required to be registered pursuant to [Ordinance No. 626].

{¶ 60} "(d) Whoever violates this section is guilty of a misdemeanor of the fourth degree. Each day a violation of this ordinance occurs shall constitute a separate and distinct offense."

{¶ 61} When these ordinances are read in pari materia, it is clear that possession of an animal registered under Ordinance No. 505.15 will not result in a violation of Ordinance No. 626. Furthermore, it is clear that there is a limit on the animals that can be grandfathered under Ordinance No. 505.15. Under the plain language of that ordinance, the animals covered by the ordinance must be registered "on or before June 15, 2002." Possession of any animal not registered by that date "shall be deemed" to be a violation of Ordinance No. 626. Thus, under the plain language of these ordinances, only the animals kept and registered in the village on or before June 15, 2002, will be allowed to remain in the village without violating Ordinance No. 626.

{¶ 62} If this conclusion were in any doubt, such doubt would be resolved by the preamble to the resolution adopting Ordinance No. 505.15, which recognized that the village may not be able to prohibit the keeping of any animal in the village that was kept before Ordinance No. 626 was enacted. The preamble specifically stated the intent to specifically grandfather "those animals" kept in the village prior to its passage in order to clarify that keeping those animals in the village would not violate Ordinance No. 626.

{¶ 63} In plain language, this means that the ordinances allow appellants to keep the animals they registered by June 15, 2002, within the village limits, but not allow appellants to keep any new animal, other than rabbits, dogs, or domesticated cats, within the village limits after that date. Appellants introduced evidence showing that their businesses depend on their ability to raise and board animals, both now and in the future. Accordingly, these ordinances clearly have some economic impact on appellants.

{¶ 64} What is unclear at this time is the extent of the economic impact this has on appellants. For example, in their motion and appellate brief, appellants claim that one couple has suffered losses of around $2,000 per month while the other couple has suffered losses of around $1,120 per month. However, this claim is not supported by the affidavits attached to the motion for summary judgment or any other evidentiary material. Furthermore, it is unclear the extent to which these purported losses actually affect appellants economically.

{¶ 65} Likewise, there is some evidence in the record showing that the ordinances have interfered with appellants' reasonable investment-backed expectations. For instance, one affidavit stated that a couple bought property in the village specifically to raise, train, and house horses and invested "thousands of dollars" in the property. However, there is no clear evidence establishing whether this investment will have been a complete waste due to the passage of these ordinances.

{¶ 66} Given these factual uncertainties, the trial court could not have terminated this case at this stage in the proceedings. The evidence in the record is simply insufficient to conclusively determine whether a taking has occurred.

Conclusion

{¶ 67} The majority rejects appellants' takings arguments by concluding that an action cannot be a taking if it is done directly by the voters, rather than by a legislative body. This conclusion is contrary to established Ohio Supreme Court case law placing legislation enacted by initiative on the same constitutional footing as legislation enacted by a legislature. Moreover, the majority uses due-process analysis when dealing with appellants' takings arguments. Accordingly, I must respectfully dissent from the majority's opinion.

{¶ 68} In this case, the trial court's order did not address the takings claim raised by appellants in their complaint. Accordingly, its judgment is not a final, appealable order, and this appeal must be dismissed for a lack of jurisdiction. Furthermore, the trial court's decision should be reversed and this case remanded for further proceedings if its order had addressed the takings claim, because there is a genuine issue regarding whether a taking has occurred.