# IN THE SUPREME COURT OF CALIFORNIA

CAL FIRE LOCAL 2881 et al.,
Plaintiffs and Appellants,

v.

CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM,
Defendant and Respondent;

STATE OF CALIFORNIA,
Intervener and Respondent.

S239958

First Appellate District, Division Three
A142793

Alameda County Superior Court
RG12661622

March 4, 2019

Chief Justice Cantil-Sakauye authored the opinion of the court, in which Justices Chin, Corrigan, Liu, Cuéllar, Kruger, and Zelon[*] concurred.

---

[*] Associate Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

CAL FIRE LOCAL 2881 v. CALIFORNIA PUBLIC
EMPLOYEES' RETIREMENT SYSTEM

S239958

Opinion of the Court by Cantil-Sakauye, C. J.

In late 2012, our Legislature enacted the California Public Employees' Pension Reform Act of 2013 (PEPRA, Stats. 2012, ch. 296, § 15; see Gov. Code, §§ 7222 et seq.), substantially revising the laws governing public employee pensions.[1] This decision addresses the constitutionality of one of the changes effected by PEPRA, the elimination of the opportunity for public employees to purchase additional retirement service credit.

The amount of a public employee's pension benefit is typically calculated as a fraction of the employee's annual compensation near the end of his or her career. The size of the fraction is generally determined by the employee's years of public employment, known as "service credit," and his or her age at retirement. The greater the service credit of an employee and the greater his or her age at retirement, the larger the fraction.

Beginning in 2003, many public employees were granted the opportunity to *purchase* up to five years of service credit by making appropriate payments to their pension fund. This

_____

[1]     Unless indicated otherwise, all further statutory citations are to the Government Code.

purchased credit, known as additional retirement service (ARS) credit, is treated like ordinary service credit upon an employee's retirement. Participating employees could therefore receive pension benefits calculated on the basis of up to five years' more public employment than they actually worked. PEPRA effectively repealed the statute granting public employees the opportunity to purchase ARS credit, although it did not alter the rights of employees who had already purchased such credit.

The parties present two issues for decision. The first is whether the opportunity to purchase ARS credit was a "vested right" — that is, a right protected by the constitutional contract clause. The terms and conditions of public employment are ordinarily considered to be statutory rather than contractual, and they are subject to modification at the discretion of the governing legislative body. Constitutional protection can arise, however, (1) when the statute or ordinance establishing a benefit of employment and the circumstances of its enactment clearly evince an intent by the relevant legislative body to create contractual rights or, (2) when, even in the absence of a manifest legislative intent to create such rights, contractual rights are implied as a result of the nature of the employment benefit, as is the case with pension rights. The second issue, which arises only if we conclude that the opportunity to purchase ARS credit is entitled to constitutional protection, is whether the Legislature's elimination of that benefit in PEPRA constituted an unconstitutional impairment of public employees' vested rights.

We conclude that the opportunity to purchase ARS credit was not a right protected by the contract clause. There is no indication in the statute conferring the opportunity to purchase ARS credit that the Legislature intended to create contractual rights. Further, unlike core pension rights, the opportunity to purchase ARS credit was not granted to public employees as deferred compensation for their work, and here we find no other basis for concluding that the opportunity to purchase ARS credit is protected by the contract clause. In the absence of constitutional protection, the opportunity to purchase ARS credit could be altered or eliminated at the discretion of the Legislature. We therefore affirm the decisions of the trial court and the Court of Appeal, which concluded that PEPRA's elimination of the opportunity to purchase ARS credit did not violate the Constitution.

Because we reach this conclusion, we have no occasion to address the second issue raised by the parties: whether the elimination of the opportunity to purchase ARS credit was an unconstitutional impairment of public employees' vested rights. The scope of constitutional protection afforded public pension rights by our prior decisions, beginning with *Allen v. City of Long Beach* (1955) 45 Cal.2d 128 (*Allen*), has come to be referred to as the "California Rule," in part because its breadth has not been widely adopted by other jurisdictions. (See, e.g., Monahan, *Statutes as Contracts? The "California Rule" and Its Impact on Public Pension Reform* (2012) 97 Iowa L.Rev. 1029, 1032, 1071-1074 (Monahan) [referring to our doctrine as the "so-called California Rule" and noting that, of the twelve states to adopt the rule, three have since modified it].) The state and many amici urge us to use this decision as a vehicle to reduce

the protection afforded pension rights by modifying or abandoning the California Rule, while plaintiffs and many other amici urge us to leave the California Rule intact. Because we conclude that the opportunity to purchase ARS credit was not a term and condition of public employment protected from impairment by the contract clause, its elimination does not implicate the Constitution. For that reason, we have no occasion in this decision to address, let alone to alter, the continued application of the California Rule.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  State Employee Pensions

Although a number of different pension plans cover public employees in California, governed by a variety of statutes, local regulations, and agreements, the plans tend to operate in a similar manner. Here, we discuss provisions relating to state workers as an illustrative example.[2] State employees are members of the California Public Employees Retirement System (CalPERS), the state pension system. Both state employees and their employers are required to make contributions to CalPERS during the course of their employment. (§§ 20170 [creating the Public Employees Retirement Fund]; 20176; 20671 et seq.; 20790 et seq.) With some exceptions, a state employee does not become eligible to

---

[2]     Although we discuss state employee pensions, the ban on ARS credit enacted by PEPRA applies to all "public retirement system[s]," defined broadly by PEPRA as "any pension or retirement system of a public employer." (§§ 7522.04, subd. (j) [defining public retirement system]; 7522.46, subd. (a) [banning ARS credit for all public retirement systems].)

receive a pension until he or she has worked for the state for at least five years and has attained the age of 50. (§ 21060, subd. (a).) Persons who leave state service without five years of service or who otherwise are "permanently separated" from state employment prior to taking retirement can elect to have their pension contributions returned to them, rather than remaining a member of CalPERS. (§§ 20731, subd. (b)(3); 20734.)

Once vested state employees reach the minimum retirement age, they are eligible to retire and begin receiving monthly retirement benefits.[3] (§ 21250 [benefits paid in monthly installments].) As noted, the amount of the benefit is generally determined by the individual employee's compensation, age at retirement, and years of service. As an

---

[3] The use of the term "vested" is potentially confusing here because the term is used in two different ways in discussing pensions. As noted, public employees become eligible to receive a pension only after some minimum period of public employment, typically five years. (E.g., § 21060, subd. (a).) Once an employee has become qualified to receive a pension by satisfying the minimum service requirement, he or she is said to be "vested" with respect to the receipt of a pension. That is not the same as having a "vested right." That term has come to refer to a benefit of public employment whose repeal or other divestment is constrained by the constitutional contract clause. Public employees acquire a vested right in their pension at the inception of employment, even though they generally do not become vested with respect to its receipt until after five years of employment. (E.g., *Packer v. Board of Retirement* (1950) 35 Cal.2d 212, 214 ["a public employee, as a part of his compensation, obtain[s] a vested right to a pension upon entering his duties"].)

example, the pension benefits of one subgroup of state and university employees are determined from a table in section 21354.1. The table sets a covered employee's yearly pension benefit at 2 percent of the employee's "final compensation," multiplied by the member's years of service credit, further multiplied by a number derived from the table.[4] The latter number is determined by the member's age at retirement and increases from a minimum of .550 at age 50 to a maximum of 1.250, applicable to retirees of age 63 and over. (§ 21354.1, subd. (a).) The net effect is to grant a pension equal to 2 percent of a member's final compensation per year of service for retirement at age 55, rising to 2.5 percent of final compensation per year of service for retirement at age 63 or above; retirement between the ages of 50 and 55 results in a less generous pension benefit. (*Ibid.*) At least a dozen similar schedules are found in the Government Code, applicable to different categories of public employees but offering benefits calculated in the same general way.[5]

---

[4] Generally speaking, "final compensation" is an employee's annual compensation, determined in various ways for different systems. For many state employees, final compensation is their highest compensation earned during any consecutive 12-month period of state service. (§ 20035, subd. (a).) For persons hired after the effective date of PEPRA, final compensation is the highest average annual compensation during any period of at least 36 consecutive months. (§ 7522.32, subd. (a).)

[5] See §§ 21353, 21353.5, 21354, 21354.3, 21354.4, 21354.5, 21362, 21363, 21363.1, 21366, 21368, 21369, 21369.1, 21369.2, 21370. Plaintiffs state in their opening brief that they and their fellow union members are covered by section 21363.4,

## B. Additional Retirement Service Credit

State employees and other members of CalPERS were granted the opportunity to purchase ARS credit in 2003 by the enactment of section 20909 (Stats. 2003, ch. 838, § 1); teachers had been granted the opportunity in 1997 (Ed. Code, § 22826; Stats. 1997, ch. 569, § 2). The concept of purchasing service credit did not originate with ARS credit. Members who had performed military service or other "public service," as defined by statute, had long been able to obtain pension service credit for that time by making appropriate payments to CalPERS. (§ 21020; See §§ 20997, 21010 et seq.; *Marzec v. Public Employment Retirement System* (2015) 236 Cal.App.4th 889, 897.) Section 20909, however, was the first opportunity for state employees to acquire "nonqualified" service credit, or service credit that did not reflect any type of service. (See 26 U.S.C. § 415(n)(3)(C) [defining "nonqualified service credit"]; § 7522.46, subd. (a).) Because ARS credit is untethered to actual service, it acquired the nickname " 'air time.' " (Assem. Com. on Pub. Employees, Retirement and Social Security, Analysis of Assem. Bill 719 (2003-2004 Reg. Sess.) Apr. 23, 2003, at p. 2.)[6]

---

which provides for a pension of 3 percent of final compensation per year of service credit, regardless of the member's age at retirement beyond the minimum age of 50. (*Id.* subd (a).)

[6] Limited excerpts from the legislative histories of PEPRA and section 20909 were included in the record before the trial court. We have also consulted more complete legislative histories compiled and maintained by our library, based largely on materials in the files of the California State Archives.

Under section 20909, a public employee with at least five years of public employment could, at any time prior to his or her retirement, make a one-time election to purchase from one to five years of ARS credit. (*Id.* subds. (a), (b).) These conditions of purchase are consistent with the requirements of federal tax law, which authorizes a tax-qualified retirement plan to provide for the acquisition of up to five years of nonqualified service credit after a member has participated in the plan for at least five years. (26 U.S.C. § 415(n)(3)(B); see Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill 719 (2003-2004 Reg. Sess.) as amended Aug. 18, 2003, p. 3 (hereafter, Sen. Rules Analysis).) To acquire ARS credit, the member was required to pay CalPERS, either in a lump sum or installments, "an amount equal to the increase in employer liability, using the payrate and other factors affecting liability on the date of the request for costing of the service credit," a figure calculated by CalPERS. (§§ 21050, subd. (a); 21052.) In other words, the employee was required to pay the present value of the increase in his or her pension benefits that would result from the purchased ARS credit, at least to the extent that increase could be estimated from circumstances prevailing at the time the employee exercised the opportunity to purchase ARS credit.

When section 20909 was enacted, the purchase of ARS credit was viewed as particularly beneficial to employees who joined public service comparatively late in life or who left public employment temporarily to raise children or to further their education, and therefore had been unable to acquire sufficient service credit for a "livable retirement income." (Sen. Rules Analysis, *supra*, at p. 4.) It was anticipated that the

financial burden on employees of purchasing ARS credit would be partially mitigated because ARS credit could, and presumably often would, be financed with funds withdrawn from tax-qualified retirement savings accounts, such as 401(k) accounts. (*Ibid.*)

The Legislature anticipated that ARS credit would be "cost neutral" to public agencies, since employees were required to pay CalPERS the full present value of the future benefits. (Sen. Rules Analysis, *supra*, at p. 3.) Yet even then, it was recognized that the eventual cost of ARS credit might exceed the purchase price paid by pensioners, most obviously for employees who experienced a significant increase in salary between the time of purchasing ARS credit and their retirement. (State and Consumer Services Agency, Enrolled Bill Rep., Assem. Bill 719 (2003-2004 Reg. Sess.) p. 4.) As the Department of Finance pointed out in opposing the enactment of section 20909, CalPERS was required to make a variety of assumptions in calculating the present value of ARS credit, all of which "contain a high degree of inaccuracy." (Department of Finance, Bill Analysis/Enrolled Bill Rep., Assem. Bill 719 (2003-2004 Reg. Sess.) Mar. 24, 2003, at p. 2.) In an analysis performed for the years 1997 to 2007, CalPERS found that, in practice, its methodology for calculating the price of ARS credit had underestimated its actual cost by 12 percent to 38 percent for various categories of state workers. (CalPERS, Review of Additional Retirement Service Credit Purchases (undated) p. 6.) CalPERS recommended revising its calculations to increase prices accordingly. (*Ibid.*)

### C. PEPRA

The centerpiece of PEPRA was a pension plan applicable only to newly hired public employees that is less expansive, and therefore less burdensome for the state and local governments, than the plans covering then-existing public employees. As compared to existing employees' pensions, the new plan increased the age at which employees could claim equivalent pension benefits, set a cap on the total compensation on which pension benefits could be based, required employees to pay one-half of the cost of funding their pensions, and required the annual compensation used to calculate pension benefits to be determined by averaging over a three-year period, rather than using a single year. (§§ 7522.02, subd. (b); 7522.10, subds. (c), (g); 7522.20, subd. (a); 7522.30, subd. (a); 7522.32, subd. (a).) All of these are less favorable than the equivalent benefits typically available to then-existing public employees.

PEPRA also modified certain statutes governing the pensions of existing employees. One of these provisions, section 7522.46, eliminated the purchase of ARS credit by public employees after December 31, 2012. (§ 7522.46, subds. (a), (b); Stats. 2012, ch. 296, § 15.) In clean-up legislation initiated by CalPERS the following year, this provision was incorporated into section 20909 itself, which now states, in part, "This section shall apply only to an application to purchase additional retirement credit that was received by the system prior to January 1, 2013, that is subsequently approved by the system." (*Id*. subd. (g), as amended by Stats. 2013, ch. 526, § 13.)

So far as we have been able to ascertain, there is nothing in the legislative history that explains the Legislature's decision to terminate the purchase of ARS credit. Its likely intent, however, can be inferred from a 12-point plan for pension reform that formed the foundation for PEPRA, published by Governor Edmund G. Brown, Jr. in October 2011.[7] In recommending the termination of ARS credit, the Governor's plan stated, "Many pension systems allow employees to buy 'airtime,' additional retirement service credit for time not actually worked. When an employee buys airtime, the public employer assumes the full risk of delivering retirement income based on those years of purchased service credit. Pensions are intended to provide retirement stability for time actually worked. Employers, and ultimately taxpayers, should not bear the burden of guaranteeing the additional employee investment risk that comes with airtime purchases." (Governor Edmund G. Brown, Jr., Twelve Point Pension Reform Plan, Oct. 27, 2011, p. 4 <https://www.gov.ca.gov/wp-content/uploads/2017/09/Twelve_Point_Pension_Reform_10.27.11.pdf> [as of Mar. 4, 2019]; all Internet citations in this

---

[7] See Sen. Rules Com., Off. of Sen. Floor Analyses Conference Completed Rep., Assem. Bill 340 (2011-2012 Reg. Sess.) Aug. 28, 2012, p. 7 ["The comprehensive pension reform proposal contained in the Conference Committee Report is based on the Governor's 12-Point Pension Reform Plan. [¶] The Conference Committee Report includes 10 of the 12 points included in the Governor's plan."].

opinion are archived by year, docket number, and case name at
<http://www.courts.ca.gov/38324.htm>.)

### D. This Litigation

Plaintiff and appellant Cal Fire Local 2881 (Union) is a
labor association whose members are employees of the
California Department of Forestry and Fire Protection, known
as "Cal Fire." The four individual plaintiffs are Cal Fire
employees. Plaintiffs filed a petition for a writ of mandate
against CalPERS challenging the elimination of ARS credit,
contending that the opportunity to purchase ARS credit was a
vested right protected by the contract clause of the California
Constitution. The trial court approved a stipulation permitting
the state to intervene.

The trial court denied the petition, ruling that the
opportunity to purchase ARS credit was not protected by the
Constitution and, even if it were, its elimination was a
" 'permissible modification to the pension plan' " because it was
"materially related to the theory and successful operation of a
pension system." (See *Cal Fire Local 2881 v. California Public
Employees Retirement System* (2016) 7 Cal.App.5th 115, 123,
129 (*Cal Fire*).) The Court of Appeal affirmed on both grounds
in a published decision. (*Id.* at pp. 127, 129.) That court based
its conclusion that the opportunity to purchase ARS credit was
not constitutionally protected on the absence of any indication
of legislative intent to create a contractual right. (*Id.* at
pp. 127-128.) It also held that the opportunity was properly
eliminated, even if it was protected by the constitution, on
reasoning similar to that of the trial court. (*Id.* at pp. 129-131.)

For the reasons discussed below, we agree with both
courts that the opportunity to purchase ARS credit was not a

benefit of employment protected by the constitutional contract clause. Given that conclusion, we have no occasion to reach the further question whether, if it were so protected, its elimination would have worked an unconstitutional impairment of public employees' contractual rights.

## II. DISCUSSION

Whether the opportunity for existing public employees to purchase ARS credit is a benefit of employment protected by the constitutional contract clause — that is, whether it is a vested right — is a question of law subject to our independent review. (*Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1128-1129 (*Wilson*).)

### A. Constitutional Protection of the Terms and Conditions of Public Employment Has Historically Been the Exception, Not the Rule

The vested rights doctrine, the foundation of plaintiffs' contention that PEPRA's elimination of the opportunity for existing public employees to purchase ARS credit was unconstitutional, is grounded in the constitutional contract clause. Both the United States and California Constitutions contain provisions that prohibit the enactment of laws effecting a "substantial impairment" of contracts, including contracts of employment.[8] (*Sveen v. Melin* (2018) 584 U.S. __ , 138 S.Ct.

---

[8] See United States Constitution, article I, section 10, clause 1 ["No state shall . . . pass any . . . law impairing the obligation of contracts . . . ."] and California Constitution, article I, section 9 ["A . . . law impairing the obligation of contracts may not be passed"]. As noted above, plaintiffs bring this challenge under the California Constitution.

1815, 1821-1822 (*Sveen*); *San Francisco Taxpayers Assn v. Board of Supervisors* (1992) 2 Cal.4th 571, 584; see *Allen v. Board of Administrators* (1983) 34 Cal.3d 114, 119.) "The Contracts Clause restricts the power of States to disrupt contractual arrangements. . . . The origins of the Clause lie in legislation enacted after the Revolutionary War to relieve debtors of their obligations to creditors. [Citation.] But the Clause applies to any kind of contract." (*Sveen*, 138 S.Ct. at p. 1821.) The federal contract clause restricts states from impairing their own contracts, as well as those between private parties. (*United States Trust Co. v. New Jersey* (1977) 431 U.S. 1 (*United States Trust*).) In this context, the term "vested right" has come to refer to the terms and conditions of public employment that are protected from impairment by the constitutional contract clause. (See *ante*, fn. 3.)

Contract clause protection of the terms and conditions of public employment historically has been the exception, rather than the rule. "[T]he terms and conditions of public employment, unlike those of private employment, generally are established by statute or other comparable enactment (e.g., charter provision or ordinance) rather than by contract." (*White v. Davis* (2003) 30 Cal.4th 528, 564 (*White*).) For this reason, public employees have generally been held to possess no constitutionally protected rights in the terms and conditions of their employment. "[I]t is well settled in California that public employment is not held by contract but by statute and that, insofar as the duration of such employment is concerned, no employee has a vested contractual right to continue in employment beyond the time or contrary to the terms and conditions fixed by law." (*Miller v. State of California* (1977)

18 Cal.3d 808, 813 (*Miller*).) It is also "well settled that public employees have no vested right in any particular measure of compensation or benefits, and that these may be modified or reduced by the proper statutory authority." (*Butterworth v. Boyd* (1938) 12 Cal.2d 140, 150 (*Butterworth*).) As we explained in *Retired Employees Assn. of Orange County v. County of Orange* (2011) 52 Cal.4th 1171 (*Retired Employees*), " 'the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the [governmental body]. [Citation.] Policies, unlike contracts, are inherently subject to revision and repeal.' " (*Id.* at p. 1185.)

In the eighty years since *Butterworth*, the growing prevalence of collective bargaining by public employees has dramatically increased the number of employees whose terms and conditions of employment are governed by express contracts, rather than solely by legislative enactments. (See Meyers-Milias-Brown Act, §§ 3500 et seq. [regulating collective bargaining by local agency employees]; Ralph D. Dills Act, §§ 3512 et seq. [regulating collective bargaining by state employees].) At least for the term of their collective bargaining agreement, the employment of such employees is largely a matter of contract, not statute. (See, e.g., *Retired Employees*, *supra*, 52 Cal.4th at p. 1182 ["our 'often quoted language that public employment is not held by contract' has limited force where, as here, the parties are legally authorized to enter (and have in fact entered) into bilateral contracts to govern the employment relationship"]; *Vallejo Police Officers Ass'n v. City of Vallejo* (2017) 15 Cal.App.5th 601, 612 (*Vallejo Police*) ["Like other contracts, MOU's [memoranda of understanding] ordinarily cover distinct periods of time, and the obligations

associated with them ordinarily terminate with the agreement"].)

Yet the growing prevalence of public employment agreements has not altered the fundamental principle that the terms and conditions of public employment, to the extent those terms and conditions derive from legislative enactments, are not generally protected by the contract clause from repeal or revision at the discretion of the legislative body. There continues to be a large number of public employees whose employment is not governed by an agreement. Even for public employees covered by an express employment contract, the issue has continued application. The covered terms and conditions of their employment may be immune from legislative modification during the term of the express agreement, but disputed issues continue to arise regarding the legislative body's power to alter the terms and conditions of employment that are not covered by the agreement or to alter the terms and conditions established by the agreement after its expiration. (See, e.g., *Retired Employees, supra,* 52 Cal.4th at pp. 1176, 1177-1178 [considering whether retirees could acquire a vested right in a health premium methodology not specified in their MOU]; *Vallejo Police,* at pp. 614-620 [finding no vested right to retiree medical contributions following expiration of MOU]; *Chisom v. Board of Retirement of Fresno County Employees' Retirement Ass'n* (2013) 218 Cal.App.4th 400, 414-416.)

Our decisions have recognized two exceptions to the general rule permitting legislative modification of statutory terms and conditions of public employment. The first, applicable to statutorily created employment rights generally,

16

affords the protection of the contract clause to statutory terms and conditions of public employment when the statute or ordinance establishing the benefit and the circumstances of its enactment clearly evince a legislative intent to create contractual rights. The second exception, which this court has historically extended primarily to pension rights, protects certain benefits of public employment by implication, even in the absence of a clear manifestation of legislative intent. Both of these means for creating vested rights are invoked by plaintiffs, and we address them separately below.

## B. Manifestly Intended Contractual Rights

*1. Terms and conditions of public employment are protected by the contract clause when the circumstances clearly evince a legislative intent to create contractual rights*

Notwithstanding the general rule that legislative enactments do not create rights protected by the contract clause, the United States Supreme Court has long recognized an exception when the legislation at issue manifests an intent to create contractual rights. In *United States Trust, supra*, 431 U.S. 1, the legislatures of New York and New Jersey had both approved a statutory covenant limiting the use of mass transit revenues to subsidize passenger rail transit, a covenant both states later repealed. (*Id.* at p. 3.) In evaluating bondholders' claim that the states' joint repeal of the covenant impermissibly impaired their rights under the federal contract clause, the high court recognized that "a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State." (*Id.* at p. 17,

17

fn. 14.) In *United States Trust*, the court found it "unnecessary
. . . to dwell on the criteria for determining whether state
legislation gives rise to a contractual obligation" because "[t]he
intent to make a contract is clear from the statutory
language . . . . Moreover, . . . the purpose of the covenant was
to invoke the constitutional protection of the Contract Clause
as security against repeal [of the covenant legislation]." (*Id*. at
pp. 17-18, citations omitted.)

We have recognized the same principle. In *Retired
Employees*, we held that the resolutions of a board of
supervisors governing the terms and conditions of county
employment could create implied contractual rights "when the
language or circumstances accompanying [enactment of the
resolutions] clearly evince a legislative intent to create private
rights of a contractual nature." (*Retired Employees*, *supra*, 52
Cal.4th at p. 1177; see also *Youngman v. Nevada Irrigation
District* (1969) 70 Cal.2d 240, 246-247 (*Youngman*) [district
employees successfully pleaded an implied contractual right to
the implementation of a salary schedule].)[9]

*Retired Employees* addressed the question, submitted to
us by the Ninth Circuit Court of Appeals, " '[w]hether, as a
matter of California law, a California county and its employees
can form an implied contract that confers vested rights to

---

[9] Both *Retired Employees* and *Youngman* were decided in
the context of local government employment. Their rationale
would appear to apply as well to legislative enactments at the
state level, but for present purposes it is sufficient for us to
assume, without deciding, that application.

health benefits on retired county employees.' " (*Retired Employees*, *supra*, 52 Cal.4th at p. 1176.) The county had entered into a series of express contracts with its employees, in the form of MOUs, relating to their terms and conditions of employment, but these agreements did not expressly address the retiree benefits for which the plaintiffs sought constitutional protection. Each of these MOUs had been ratified by a resolution of the board of supervisors. (*Id*. at pp. 1177-1178.) We recognized the ordinary rule that public employment is a creature of statute, but we held that rule to be of "limited force" when "the parties are legally authorized to enter (and have in fact entered) into bilateral contracts to govern the employment relationship." (*Id*. at p. 1182.) We ultimately "conclude[d] generally that legislation in California may be said to create contractual rights when the statutory language or circumstances accompanying its passage 'clearly "... evince a legislative intent to create private rights of a contractual nature enforceable against the [governmental body]." ' [Citations.] Although the intent to make a contract must be clear, our case law does not inexorably require that the intent be express. [Citation.] A contractual right can be implied from legislation in appropriate circumstances. [Citation.] Where, for example, the legislation is itself the ratification or approval of a contract, the intent to make a contract is clearly shown." (*Id*. at p. 1187.) As the final sentence of that quotation suggests, the court found the existence of the MOUs critical to its conclusion that an implied contractual right could have been created. (*Id*. at p. 1183 ["Where the relationship *is* governed by contract, a county may be bound by an implied contract (or by implied terms of a

written contract), as long as there is no statutory prohibition against such an agreement"].)

### 2. *There is no indication that the Legislature intended to create a contractual right to purchase ARS credit*

Plaintiffs rely on *Retired Employees*, *supra*, 52 Cal.4th 1171, in arguing for a vested right in the opportunity to purchase ARS credit, characterizing that decision as finding a contractual right if the benefits "were promised when employees provided service."

Before addressing this argument, it is important to make clear what is *not* at issue here. The only change made by PEPRA relating to ARS credit was to eliminate the opportunity to purchase ARS credit after the end of 2012. PEPRA does not purport to affect the rights of employees who took advantage of the opportunity to purchase ARS credit while it was still available. Persons who actually purchased ARS credit therefore remain in precisely the same position as they were prior to PEPRA, and we need not consider their circumstances further. What is claimed here to be a vested right is the *opportunity to purchase* ARS credit, rather than any of the rights conferred by its purchase.

As discussed above, it was critical to *Retired Employees'* holding that the legislative enactment on which the implied contractual rights were premised was a resolution approving an express contract of employment. (*Retired Employees*, *supra*, 52 Cal.4th at pp. 1183, 1187.) The county board's ratification of this contract provided the requisite clear manifestation of intent to create contractual rights. Nothing of the sort occurred in connection with the opportunity to purchase ARS

credit. The Legislature did not engage in any sort of negotiation with the public employees covered by section 20909, let alone ratify an express or implied contract reflecting its terms. The Legislature simply enacted a statute granting the opportunity to purchase ARS credit. As *Retired Employees* noted, such statutes, which announce a policy rather than create a contract, " 'are inherently subject to revision and repeal.' " (*Retired Employees, supra,* at p. 1185.)

Plaintiffs' characterization of ARS credit as "promised when employees provided service" suggests the existence of an affirmative commitment by the Legislature to make the opportunity to purchase ARS credit available indefinitely, but they cite no persuasive evidence of such a commitment. Plaintiffs rely primarily on a clause of section 20909, the statute conferring the opportunity to purchase ARS credit, which states that "[a] member may elect to receive this additional retirement service credit at any time prior to retirement by making the contributions as specified in Section 21050 and 21052." (*Id.* subd. (b).) They contend that this provision manifests the Legislature's intent to permit existing employees to exercise the opportunity to purchase ARS credit at any point prior to their retirement by (1) working for the five-year period and (2) thereafter making the required payments to CalPERS. Although we recognize that the language, read in isolation, can be interpreted as plaintiffs urge, we agree with the trial court and Court of Appeal that this construction reads too much into subdivision (b).

Rather than a commitment to maintain the opportunity to purchase ARS credit for the duration of the employment of existing public employees, this portion of subdivision (b), when

read in the context of the remainder of section 20909, simply established that the one-time election to purchase ARS credit could be made at any point during an employee's career and that the election to purchase was not complete until the required payments to the pension system had been made. (See *Elks Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 610 [" ' "[every] statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect" ' "].) The remaining provisions of section 20909 establish conditions applicable to the purchase of ARS credit — the requirement of written notice, the maximum number of years available for purchase, the minimum service time required before a purchase can be made, the requirement to purchase in whole-year increments, the limitation to one purchase event, restrictions on the applicability of ARS credit for non-pension purposes, and the type of employees eligible to make the purchase.[10]   (*Id.* subds. (a), (b), (d), (e).)   It is therefore

---

[10]   The full text of section 20909 follows:

"(a) A member who has at least five years of credited state service, may elect, by written notice filed with the board, to make contributions pursuant to this section and receive not less than one year, nor more than five years, in one-year increments, of additional retirement service credit in the retirement system.

"(b) A member may elect to receive this additional retirement service credit at any time prior to retirement by making the contributions as specified in Sections 21050 and 21052. A member may not elect additional retirement service credit under this section more than once.

consistent with the statute's remaining provisions to read the portion cited by plaintiffs as establishing other, similar conditions, specifying the time during an employee's career when ARS credit can be purchased and the manner of completing that election. Given the existence of this more plausible reading, plaintiffs' interpretation does not "clearly evince a legislative intent to create private rights of a contractual nature," which is required before such rights will be found. (*Retired Employees, supra*, 52 Cal.4th at p. 1177; see *id.* at p. 1187 ["the intent to make a contract must be clear"].) As the Court of Appeal persuasively explained, "this phrase

---

"(c) For purposes of this section, 'additional retirement service credit' means time that does not qualify as public service, military service, leave of absence, or any other time recognized for service credit by the retirement system.

"(d) Additional retirement service credit elected pursuant to this section may not be counted to meet the minimum qualifications for service or disability retirement or for health care benefits, or any other benefits based upon years of service credited to the member.

"(e) This section only applies to the following members:

"(1) A member while he or she is employed in state service at the time of the additional retirement service credit election.

"(2) A member of the system defined in Section 20324.

"(f) For purposes of this section, 'state service' means service as defined in Section 20069.

"(g) This section shall apply only to an application to purchase additional retirement credit that was received by the system prior to January 1, 2013, that is subsequently approved by the system."

means just what it says and no more — to wit, eligible employees could opt to purchase the service credit at any time," rather than being required to purchase ARS credit at a particular point in their public careers. (*Cal Fire, supra,* 7 Cal.App.5th at p. 127.) To convert "this straightforward reading of this statutory phrase [into a] promise by the Legislature *not to modify or eliminate* the option to purchase service credit" would fly in the face of "the legal presumption *against* the creation of a vested contractual right." (*Ibid.*) Beyond this provision, plaintiffs have pointed to no text, legislative history, or other evidence suggesting that the Legislature intended to make ARS credit an irrevocable feature of the employment of then-existing public employees.[11]

In arguing for an implied contract, plaintiffs rightly note that "[p]ension statutes have rarely, if ever, explicitly stated that a vested right is being created." As discussed below, our cases holding that the pension rights of public employees are protected by the contract clause have done so even without a manifest indication of legislative intent. We have never held, however, that the constitutional protection afforded pension rights, which attaches even in the absence of manifest

---

[11] In addition to citing section 20909, subdivision (b), plaintiffs contend that the Legislature should be presumed to have intended the creation of a contractual right in the opportunity to purchase ARS credit because the statute contains no affirmative indication that the opportunity was *not* contractual. The argument disregards the requirement of a clearly evinced legislative intent to create contractual rights in *Retired Employees, supra,* 52 Cal.4th at p. 1177.

legislative intent to create contract rights, extends generally to all other benefits of public employment.

## C. Implied Contractual Rights

Given the absence of circumstances clearly evincing a legislative intent to create a contractual right to purchase ARS credit, we turn to plaintiffs' alternative argument that the opportunity to purchase ARS credit is entitled to the same type of constitutional protection as public employee pension rights.

> *1. The Constitution protects an implied contractual right for California's public employees to receive statutory pension benefits because those benefits constitute deferred compensation*

Our decisions recognize that, through his or her service, a public employee acquires a constitutionally protected implied contractual right to receive statutory pension benefits upon retirement. "A public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment. Such a pension right may not be destroyed, once vested, without impairing a contractual obligation of the employing public entity." (*Betts v. Board of Administration* (1978) 21 Cal.3d 859, 863 (*Betts*).)

The rationale for the constitutional protection of statutory pension rights was established over a century ago in *O'Dea v. Cook* (1917) 176 Cal. 659 (*O'Dea*). The plaintiff in *O'Dea* was the widow of a San Francisco police officer who died as a result of injuries suffered in the line of duty. When she sought to claim her late husband's pension benefits, which were created by the city charter (*id*. at p. 660), the trustees overseeing the pension plan refused her, citing an amendment

to the plan that was enacted after the occurrence of her husband's fatal injury but before his death. *O'Dea* is recognized for rejecting the legal theory that public employee pensions constitute a gratuity, a legal argument that persisted well into the last century. (Monahan, *supra,* 97 Iowa L.Rev. at p. 1052; see *Dodge v. Board of Education* (1937) 302 U.S. 74, 79 [affirming a state court finding of no vested right to a teacher pension created by statute and characterizing the benefits as "gratuities"].) But *O'Dea* was also the first decision to articulate the legal foundation for our subsequent decisions finding a vested right to public employee pensions. In rejecting the gratuity theory, the court held, without further elaboration, "where, as here, services are rendered under . . . a pension statute, the pension provisions become a part of the contemplated compensation for those services and so *in a sense a part of the contract of employment itself.*" (*O'Dea*, at pp. 661-662, italics added.)

Although *O'Dea* went no further in articulating a basis for the legal protection of pension rights, the connection to the constitutional contract clause was subsequently recognized by *Kern v. City of Long Beach* (1947) 29 Cal.2d 848 (*Kern*). There we observed that our decisions following *O'Dea* had held that "the right to a pension vests upon acceptance of employment." (*Kern*, at p. 852.) In reconciling this holding with the statutory nature of pension rights, *Kern* reasoned that the decisions "are not in conflict with language appearing in some cases to the general effect that public employment is not held by contract. [Citations.] . . . [P]ublic employment gives rise to certain obligations which are protected by the contract clause of the Constitution, including the right to the payment of salary

which has been earned.  Since a pension right is 'an integral portion of contemplated compensation' [citation], it cannot be destroyed, once it has vested, without impairing a contractual obligation.  Thus the courts of this state have refused to hold, in the absence of special provision, that public employment establishes tenure rights, but have uniformly held that pension laws such as the [city charter provision at issue in *Kern*] establish contractual rights." (*Id*. at pp. 852-853.)

In justifying the constitutional protection given pension benefits, *Kern* did not rely on, or even inquire into, manifestations of legislative intent to confer contractual rights. Rather, the *Kern* court found that a contractual right to receive pension benefits is implied, despite their statutory foundation, because they constitute a form of deferred compensation.  As *Kern* explained, a public employee "is not fully compensated upon receiving his salary payments because, in addition, he has then earned certain pension benefits, the payment of which is to be made at a future date.  While payment of these benefits is deferred, and is subject to the condition that the employee continue to serve for the period required by the statute, the mere fact that performance is in whole or in part dependent upon certain contingencies does not prevent a contract from arising, and the employing governmental body may not deny or impair the contingent liability any more than it can refuse to make the salary payments which are immediately due." (*Kern*, *supra*, 29 Cal.2d at p. 855.)  Given their character as deferred compensation, the receipt of legislatively established pension benefits is protected by the contract clause, even in the absence of a manifest legislative intent to create contractual rights.

Our subsequent decisions have confirmed that the receipt of pension benefits is granted constitutional protection because the benefits constitute a portion of the compensation awarded by the government to its employees, paid not at the time the services are performed but at a later time. As stated in *Miller*, *supra*, 18 Cal.3d 808, "Pension rights, unlike tenure of civil service employment, are deferred compensation earned immediately upon the performance of services for a public employer '[and] cannot be destroyed . . . without impairing a contractual obligation. Thus the courts of this state have refused to hold, in the absence of special provision, that public employment establishes tenure rights, but have uniformly held that pension laws . . . establish contractual rights.' " (*Id.* at pp. 814; see also, *White, supra*, 30 Cal.4th at p. 564 ["public employment gives rise to certain obligations, protected by the contract clause of the Constitution"]; *Legislature v. Eu* (1991) 54 Cal.3d 492, 533 ["Decisions of this court have assumed the federal contract clause protects the vested pension rights of public officers"].)[12]

---

[12] Decisions outside California have characterized public employee pension plans as "an implied-in-fact unilateral contract" and justified their constitutional protection on this ground. (*McGrath v. Rhode Island Retirement Bd.* (1st Cir. 1996) 88 F.3d 12, 17; see *ibid.* [characterizing this view as "fairly well settled" and "applied repeatedly to state and municipal pension plans"]; see also *Moro v. State* (Or. 2015) 351 P.3d 1, 20-21; *Taylor v. City of Gadsden* (11th Cir. 2014) 767 F.3d 1124, 1134; *State ex rel. Horvath v. State Teachers Retirement Bd.* (Ohio 1998) 697 N.E.2d 644, 653-654; *Christensen v. Minneapolis Municipal Employees Retirement Bd.* (Minn. 1983) 331 N.W.2d 740, 747-748.) As explained in

We have consistently recognized that elements of public employee compensation other than pension benefits also may be entitled to this type of implied contractual protection. In *Kern*, for example, we stated that "public employment gives rise to certain obligations which are protected by the contract clause of the Constitution, including the right to the payment of salary which has been earned." (*Kern*, *supra*, 29 Cal.2d at p. 853.) To the same effect, we stated in *White*, that "although the conditions of public employment generally are established by statute rather than by the terms of an ordinary contract, once a public employee has accepted employment and performed work for a public employer, the employee obtains certain rights arising from the legislative provisions that establish the terms of the employment relationship — rights that are protected by the contract clause of the state Constitution from elimination or repudiation by the state." (*White*, *supra*, 30 Cal.4th at p. 566.) Our actual application of the contract clause to statutory terms and conditions of public employment outside the pension context, however, has been limited to the protection of earned salary (*id.* at pp. 565-566, 570-571 [state employees are constitutionally entitled to receive compensation for work they have performed]) and the compensation "promised" to judges at the inception of their

---

*Hoefel v. Atlas Tack Corp.* (1st Cir. 1978) 581 F.2d 1, "the modern view [is] that the promise of a pension constitutes an offer which, upon performance of the required service by the employee becomes a binding obligation." (*Id.* at p. 4.) That view is consistent with the general approach, if not the express analysis, of our decisions.

term of office.  (*Olson v. Cory* (1980) 27 Cal.3d 532, 538-539
(*Olson*) [state judges are entitled to receive compensation set
by legislation at the beginning of their judicial term].)[13]

### 2. *The opportunity to purchase ARS credit was not a form of deferred compensation*

We first consider whether the opportunity to purchase
ARS credit was a form of deferred compensation, in the nature
of pension benefits, and entitled to contract clause protection
on that basis.

Pension benefits, the classic example of deferred
compensation, flow directly from a public employee's service,
and their magnitude is roughly proportional to the time of that
service.  Just as each month of public service earns an
employee a month's cash compensation, it also earns him or
her a slightly greater benefit upon retirement.  In this way,
pension benefits are, literally, earned by an employee's work.
Upon retirement, this additional component of his or her

---

[13]  Decisions of the Courts of Appeal have extended the
principles developed in our pension cases to protect a wider
range of public employment benefits. (E.g., *California League
of City Employee Associations v. Palos Verdes Library Dist.*
(1987) 87 Cal.App.3d 135, 137 (*California League*) [finding
contract clause protection for terms and conditions of
employment that constituted longevity benefits].)  We have no
occasion here to address the merits of that or similar decisions
(see *Retired Employees*, *supra*, 52 Cal.4th at p. 1190 [accepting
criticism of *California League*]), but we do not intend to
suggest that implied contract clause protection is limited to the
circumstances addressed in our own prior decisions.

compensation is paid to the employee in the form of pension benefits.

In contrast, the opportunity to purchase ARS credit, when it existed, was made available at the option of each individual employee. If not taken advantage of, the opportunity expired upon an employee's retirement or termination of employment. Further, the amount of an eligible employee's service was entirely irrelevant to his or her exercise of the opportunity. Once the five-year qualification period was served, further public employment did not increase the amount of ARS credit that an employee could purchase or in any other way affect his or her opportunity. In contrast with pension benefits, in which a critical determinant is an employee's term of public employment, the factor that determined the benefit received through the purchase of ARS credit was simply the number of years of ARS credit an employee purchased. And as noted, all vested employees, regardless of service time, had the same opportunity to purchase from one to five years of ARS credit. In fact, the opportunity to purchase ARS credit was so unconnected to actual service time that a public employee who had worked just the minimum of five years' public employment and was otherwise eligible to retire could, at least in theory, have doubled his or her pension benefit by purchasing five years' ARS credit and retiring soon after.

Plaintiffs argue that it was necessary for employees to "earn," in a sense, the right to purchase ARS credit by working in public employ for five years. (§ 20909, subd. (a).) We are not persuaded, however, that the imposition of this requirement created a constitutionally protected right. As the state points out, the five-year requirement was required to

make section 20909's authorization of ARS credit compliant with federal tax law, which limits the purchase of nonqualified service credit to persons who have participated in a pension plan for at least five years.  (26 U.S.C. § 415(n)(3)(B)(ii).) Further, five years of service is generally required for an employee to qualify to receive a pension.  (E.g., § 21060, subd. (a).)  The five year requirement simply precluded the purchase of ARS credit by employees who had not yet established their eligibility for a pension.  In light of these independent policy justifications for the existence of the requirement, we find no basis for concluding that the opportunity to purchase ARS credit was granted as deferred compensation for an employee's work during the five-year period.

The opportunity to purchase ARS credit was not different in form from a variety of other optional benefits offered to public employees in connection with their work.  In addition to their salary or hourly pay, it is not unusual for public employees to be offered the opportunity to purchase different types of health insurance benefits from a variety of providers; to purchase life and long-term disability insurance; and to create a flexible spending account, by which certain medical and child care expenses can be paid with pre-tax income.  We have never suggested that this type of benefit is entitled to protection under the contract clause.

3. *There is no other basis to find implied contract
   clause protection for the opportunity to purchase
   ARS credit*

   a. *Even if viewed as an offer of a unilateral
      contract, section 20909 was properly revoked by
      the Legislature*

Plaintiffs argue that opportunity to purchase optional benefits such as these is protected by the contract clause because it constitutes "an offer of a unilateral contract term for which performance is tendered by beginning and continuing employment." Except under the circumstances discussed above, statutory terms and conditions of public employment do not create contractual rights. (*Miller*, *supra*, 18 Cal.3d at pp. 813-814.) Yet even if we treat section 20909 as constituting an offer of a unilateral contract, the offer was revocable until accepted by the actual purchase of ARS credit; it did not require the state to make the opportunity to purchase ARS credit available for the duration of the careers of existing employees.

A unilateral contract is one that is accepted by performance. (*Davis v. Jacoby* (1934) 1 Cal.2d 370, 378-379; *Los Angeles Traction Co. v. Wilshire* (1902) 135 Cal. 654, 658 [a unilateral contract is "a mere offer that, if subsequently accepted and acted upon by the other party to it, would ripen into a binding, enforceable obligation"]; Civ. Code, § 1584.) Under ordinary principles of contract law, such an offer can be revoked or modified prior to acceptance — in other words, prior to the promisee's performance of the act constituting performance. (*T.M. Cobb Co. v. Superior Court* (1984) 36 Cal.3d 273, 278; Civ. Code, § 1586; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, §§ 166-167, pp. 202-204.)

Under section 20909, to accept the "offer" to purchase ARS credit, a public employee must (1) file a written election with the employee's pension board (*id.* subd. (a)) and (2) make appropriate payments to the retirement system (*id.* subd. (b)). Accordingly, even if section 20909 were treated as establishing the offer of a unilateral contract, the Legislature was entitled to revoke that offer as to all public employees who had yet to make a written election and the required payments. In PEPRA, the Legislature did just that.

Plaintiffs argue that engaging in public employment was sufficient to prevent revocation of the section 20909 offer because an offeror's right to revoke or modify a unilateral contract ends once partial performance occurs. (*State of California v. Agostini* (1956) 139 Cal.App.2d 909, 914 [" 'If an offer for a unilateral contract is made, and part of the consideration requested in the offer is given *or tendered* by the offeree in response thereto, the offeror is bound by a contract' "].) We disagree, however, with the premise of their argument, that public employment constituted partial consideration for the acquisition of ARS credit. The opportunity to purchase ARS credit was *conditioned on* public employment, but it was not offered *in exchange for* public service. For those employees who had already been publicly employed for five years at the time section 20909 was enacted in 2003, no public service was required to qualify for an election to purchase ARS credit. Such employees' mere status as public employees on the effective date was sufficient. Once other public employees had served the five years necessary to qualify to receive a pension, they were also qualified for full rights under section 20909. Although continuing public

employment was necessary to retain the qualification to make an election, that continuing service did not bring an employee any closer to acquiring ARS credit. Performance — the consideration for the acquisition of ARS credit — required the filing of a written election and payment of the necessary sums.

Our conclusion in this regard is bolstered by the requirement in section 21052, which sets the terms of payment for ARS credit, that an employee contribute the full amount of "the increase in employer liability" in order to acquire ARS credit. (*Id.*) An employee's public service appears not to have been viewed by the Legislature as constituting partial consideration for an election under section 20909, since the employee received no offsetting credit for the value of that service in purchasing ARS credit.

In this regard, plaintiffs argue that a contractual right with respect to the opportunity to purchase ARS credit should be found because public employees reasonably expected that the opportunity would continue to be made available for the duration of their employment. The only cited basis for those "reasonable expectations," however, is the belief that the opportunity to purchase ARS credit would continue to exist in the future because it "was in effect for ten years." The argument proves too much. We have never held that statutory terms and conditions of public employment gain constitutional protection merely from the fact of their existence, even if they have persisted for a decade.[14] Such a rationale would directly

---

[14] In one prior decision, *Betts, supra,* 21 Cal.3d 859, we suggested that public employees' "contractual pension

contradict the general principle that such terms and conditions are not a matter of contract and are generally subject to legislative change. (*Miller, supra,* 18 Cal.3d at pp. 813-814; *Butterworth, supra,* 12 Cal.2d at p. 150.)

> b. *The opportunity to purchase ARS credit was not
>    entitled to constitutional protection solely
>    because it involved the pension system*

Plaintiffs also argue that the opportunity to purchase ARS credit was protected by the contract clause because it was a "pension right," enacted as part of the public employee retirement law and implemented through the pension system. As plaintiffs phrase it, the opportunity to purchase ARS credit constituted a vested right because, if an employee exercised that opportunity, "it increased the pension benefit." We have never held, however, that a particular term or condition of public employment is constitutionally protected solely because it affects in some manner the amount of a pensioner's benefit.

Our decision in *Miller, supra,* 18 Cal.3d 808, is illustrative. The plaintiff in *Miller* was a state tax attorney who was forced to retire upon reaching the age of 67, the

---

expectations" were relevant to determining the extent of their vested pension rights. (*Id.* at p. 866; see similarly, *Bellus v. Eureka* (1968) 69 Cal.2d 336, 341, 350 [employee expectations relevant to interpreting terms of pension plan].) It is one thing to consider employees' expectations in determining the *extent* of protected rights. It is a different matter, and simply circular, to consider employees' expectations in determining whether a particular benefit is protected at all, at least when those expectations are based solely on the existence of the benefit.

statutory age of mandatory retirement from state service. At the time he began his state employment, and until a few years before his retirement, the mandatory age of retirement was 70, and the plaintiff's pension benefit would have been less if he was required to abide by the lower retirement age. (*Id.* 18 Cal.3d at p. 811.) Despite the impact on the plaintiff's pension benefit, we declined to hold that he had a vested right to retire according to the mandatory age in effect at the time he joined state service. (*Id.* at pp. 812, 815-817.)

We began our discussion by reiterating the familiar principle that public employment in California is a creature of statute, not contract, and "no employee has a vested contractual right to continue in employment beyond the time or contrary to the terms and conditions fixed by law." (*Miller, supra,* 18 Cal.3d at p. 813.) "In view of these long and well settled principles," we concluded "that the power of the Legislature to reduce the tenure of plaintiff's civil service position . . . by changing the mandatory retirement age was not and could not be limited by any contractual obligation." (*Id.* at p. 814.) We distinguished cases involving pension rights, explaining that pension rights, "unlike tenure of civil service employment," are "deferred compensation" and therefore protected by the contract clause. (*Ibid.*)

We then turned to a second question, whether the impact of the legislation on the plaintiff's pension benefits "nevertheless work[ed] an impairment of any vested right to earn a larger monthly pension based upon continued state service until age 70." (*Miller, supra,* 18 Cal.3d at p. 815.) Drawing on decisions holding that "the right to pension benefits vests upon the acceptance of employment," the

plaintiff contended that "upon acceptance of public employment [he] acquired a vested right to a pension based on the system then in effect," which allowed him to earn maximum benefits by working to age 70. (*Id.* at pp. 815, 817.) We rejected the argument because the plaintiff had failed to satisfy the prerequisite for maximum benefits, that he work until age 70. Although we recognized that it was the legislative enactment that mandated his retirement before he reached the age of 70, we found no vested right to achieve the maximum pension benefit because, as discussed above, "plaintiff had no vested contractual right to continue working for any specified period of time." (*Id.* at p. 817.) "In short, [the plaintiff's] membership in [the state retirement system] did not confer on him the right to remain in state employment beyond age 67 and he had no constitutionally protected right to continue in his position until age 70 in order to receive a larger retirement allowance. . . . [¶] [T]he power of the Legislature, unfettered by contract, reduced the mandatory age of retirement and thereby created the condition subsequent whose occurrence not only terminated plaintiff's employment but also defeated his expectation of additional salary and a larger retirement allowance." (*Ibid.*)

A second decision illustrating the same principle is *Creighton v. Regents of University of California* (1997) 58 Cal.App.4th 237 (*Creighton*), which involved an early retirement program implemented to cope with budget cuts at a university laboratory. Eligible employees, who were covered by a defined benefit pension plan, were given a three-month period to decide whether to accept immediate retirement in return for an additional five years of service credit. When, two

weeks into the three-month period, administrators concluded that the program was too generous, they reduced the offer to an additional three years of service credit for persons who had not yet accepted the offer. This change naturally reduced the size of the pension benefits available to employees who took advantage of the program. (*Id.* at p. 241.) The plaintiffs, who accepted early retirement after the reduction of the offer, sued to obtain the benefit of the original proposal, contending that because the program concerned their pension plan they had a vested right to the terms of the original proposal. (*Id.* at p. 242.)

The Court of Appeal rejected the claim. The court accepted that the program constituted a "retirement benefit," thereby distinguishing it from other types of compensation, but it held that the program was "different *in kind* from the benefits governed by the [line of cases granting constitutional protection to pension benefits], none of which concerned a one-time, special, elective incentive offered to eligible employees during a short, specified 'window' period, in response to specific financial exigencies." (*Creighton*, *supra*, 58 Cal.App.4th at pp. 243-244, fn. omitted.) The document governing the early retirement program expressly stated that it " 'shall not be a vested or accrued Plan benefit.' " (*Id.* at p. 244.) Based on that provision, the court had "no difficulty in concluding that the language . . . clearly and unambiguously means that [the program] creates no vested right to either its additional age and service credits or the resulting enhanced pension payments." (*Ibid.*) "Rather," the court held, "it is a limited offer of enhanced benefits which, upon an eligible employee's

timely acceptance . . . , and with consideration . . . , creates a separate binding contract." (*Id.* at p. 245.)

As *Miller* and *Creighton* demonstrate, a term and condition of public employment that is otherwise not entitled to protection under the contract clause does not become entitled to such protection merely because it affects the amount of an employee's pension benefit. In any event, although the purchase of ARS credit does increase the amount of a pension benefit, as plaintiffs argue, it does not affect the amount of the pension benefit that represents deferred compensation. That portion of the pension benefit is the same for employees who elect to purchase ARS credit and those with the identical employment experience who decline to purchase it. Acquiring ARS credit merely adds an amount attributable to the purchased service credit to the monthly benefit payable as deferred compensation. Rather than compensation for public employment, the increase in pension benefits from the purchase of ARS credit is a return of, and perhaps a return on, the funds used to make the purchase.

Plaintiffs cite *Wilson, supra,* 52 Cal.App.4th 1109, in support of their position, arguing the decision rejected a distinction between "pension benefits" and "pension rights." *Wilson* addressed the constitutionality of a change in the manner in which the state made its contributions to the state pension fund, from funding on a current basis to funding a year in arrears. (*Id.* at pp. 1117-1118.) In the process, the court rightly rejected the state's argument that the vested rights doctrine applies only to changes in pension benefits, as opposed to changes in other aspects of the pension system. As the court noted, the doctrine applies to the "modification of any 'vested

40

contractual pension right,' " which prior decisions had held to include the manner of pension funding. (*Id.* at p. 1145.) Although *Wilson* rightly held that " 'vested contractual pension right[s]' " encompass more than the benefits paid by a pension system, it did not attempt to define the scope of such rights, beyond the funding mechanism actually addressed in the decision. For the reasons stated above, we conclude that the opportunity to purchase ARS credit was not a vested contractual pension right.

### c. *The opportunity to purchase ARS credit is not entitled to constitutional protection under* Olson v. Cory

We held in *Olson, supra*, 27 Cal.3d 532, that state judges are entitled under the contract clause to receive, for the duration of their term, the compensation established by statute for their position at the outset of their term, characterizing this as "[p]romised compensation." (*Id.* at p. 538.) The plaintiffs in *Olson* were a group of current and former California judges who challenged an amendment to the statute governing judicial compensation that reduced their cost-of-living increases. As a result of the legislation, judges would receive a five percent salary increase, rather than the fractionally greater increase that would have been available prior to the amendment. (*Id.* at pp. 536-537.) *Olson* found the legislation unconstitutional on two independent grounds: (1) the statute violated our Constitution's prohibition against the reduction of an elected state officer's salary during his or her term of office (*id.* at pp. 537, fn. 2 & 543-544; see Cal. Const., art. III, § 4); and (2) the statute violated judicial officers' vested rights under the contract clause.

Our consideration of the contract clause issue began by acknowledging the case law holding that public employment "is not held by contract and therefore is not protected by the contract clause." (*Olson*, *supra*, 27 Cal.3d at p. 537.) We distinguished those decisions, however, on the grounds that the matter at hand concerned "the right to compensation by persons serving their term of public office to which they have undisputed rights." (*Id.* at p. 538.) We found the situation analogous to the circumstances in *Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296 (*Sonoma County*), which held that a state statute reducing public employee cost-of-living increases embodied in a memorandum of understanding ran afoul of the contract clause. (*Id.* at pp. 302-303, 313-314.) Characterizing "the elements of compensation for [public] office" to be "contractually vested upon acceptance of employment," *Olson* held that the contract clause precludes the Legislature, during the term of a judicial officer, from reducing the benefits available at the commencement of his or her term. (*Olson*, *supra*, 27 Cal.3d at pp. 538, fn. 3 & 539.) We recognized that if a judge chose to enter a new term of office after the effective date of the challenged legislation, he or she would be subject to the reduced compensation established there. (*Id.* at p. 540.)

*Olson* does not support plaintiffs' claim of a vested right to purchase ARS credit. First, critical to *Olson*'s reasoning was the defined term of office served by judicial officers. (See *Olson*, *supra*, 27 Cal.3d at p. 538, fn. 3 [distinguishing *Millholen v. Riley* (1930) 211 Cal. 29, because it concerned a public employee whose employment "apparently could be terminated at will"].) *Olson* treated the statutory employment

benefits available to a judge at the beginning of his or her term as, in effect, a contract for the length of the term, and its ruling was effective only for the duration of a judge's term. The decision anticipated that upon entering into a new term, judges would be subject to the statutory terms and conditions of employment then in effect. (*Id.* at p. 540.) Plaintiffs and the other employees affected by PEPRA's elimination of the opportunity to purchase ARS credit do not have discrete terms of service. They claim an open-ended entitlement to ARS credit for the duration of their public careers. Second, *Olson* relied on the central role played by monetary compensation in the employment decision. As the court noted, "[a] judge entering office is deemed to do so in consideration of — at least in part — salary benefits then offered by the state for that office." (*Id.* at p. 539.) Compared to salary benefits, the subject of *Olson*, the opportunity to purchase ARS credit was a minor part of the benefits available to public employees. Although it might have been a desirable optional benefit for some employees, its significance was likely minimal in comparison to salary, vacation, health care, and pension benefits. Even if *Olson* were to be applied outside the context of state officers serving for a fixed term, we would be unwilling to extend its holding to all of the terms and conditions of a public employee's employment, without regard to the significance of those benefits. As discussed above, we have never held that the terms and conditions of public employment are protected by the contract clause merely because of their existence. If *Olson* were applied to protect a relatively minor benefit, such as the opportunity to purchase ARS credit, there would be little left of that principle.

### d. A legal opinion expressed by CalPERS did not create contractual rights

As a final note, plaintiffs argued in the courts below that the opportunity to purchase ARS credit should be found a vested right because CalPERS once characterized it as such in a publication. (CalPERS, Vested Rights of CalPERS Members: Protecting the Pension Promises Made to Public Employees (July 2011).) The publication presented this conclusion as the result of "[CalPERS's] understanding of the current state of vested rights law in California." (*Id.* at p. 13.) Plaintiffs do not explicitly repeat their argument in this court, but they cite the CalPERS publication occasionally in their briefs as supporting the protected nature of ARS credit rights. Whether the opportunity to purchase ARS credit is a constitutionally protected right is an issue of constitutional law, not pension law. With due respect to CalPERS, its interpretations of the state Constitution are not entitled to the same deference as its interpretations of California's pension laws. (See, e.g., *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 [agency entitled to deference when interpreting statutes and regulations within its " 'expertise and technical knowledge' "].)

## III. DISPOSITION

The state and many amici curiae have urged us to use this decision as an occasion to re-examine the California Rule, the doctrine developed in our prior decisions defining the scope of constitutional protection afforded pension rights. Our holding that the opportunity to purchase ARS credit is not a vested right precludes such a re-examination. Underlying the California Rule is the constitutional contract clause, which

prohibits state laws that impair contractual obligations. Because we conclude that California's public employees have never had a contractual right to the continued availability of the opportunity to purchase ARS credit, the question of whether PEPRA worked an unconstitutional impairment of protected rights does not arise. Necessarily, if there was no contractual right to ARS credit in the first place, a law eliminating ARS credit could not have impaired a contractual right. Our decision in this matter therefore expresses no opinion on the various issues raised by the state and amici curiae relating to the scope of the California Rule.

For the reasons stated above, we affirm the decision of the Court of Appeal.

**CANTIL-SAKAUYE, C. J.**

**We Concur:**

**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**ZELON, J.***

———————————————

\* Associate Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

CAL FIRE LOCAL 2881 v. CALIFORNIA PUBLIC
EMPLOYEES' RETIREMENT SYSTEM
S239958


Concurring Opinion by Justice Kruger


I concur in the majority opinion, which I have signed. I write separately to expand briefly on a key element of the analysis: why the opportunity to purchase additional retirement service (ARS) credits was not an employment benefit that vested by implication, as were the pension benefits at issue in *Betts v. Board of Administration* (1978) 21 Cal.3d 859, *Kern v. City of Long Beach* (1947) 29 Cal.2d 848, and similar cases.

Our cases concerning the vesting of public employee pension rights are most easily understood through the lens of ordinary contract law principles. Under those principles, an implied-in-fact unilateral contract can arise from the government's offer of an employment benefit in exchange for the public employee's acceptance by entering into or continuing in public service. When the benefit is one that will be provided only in the future—like a pension—the formation of such a contract vests the right to that benefit, making the government's offer irrevocable as to employees who have worked for the deferred benefit and earned it as part of the employment bargain. (Maj. opn., *ante*, at p. 28, fn. 12; *Betts v. Board of Administration*, *supra*, 21 Cal.3d at p. 863; *Kern v.*

*City of Long Beach*, *supra*, 29 Cal.2d at pp. 851–852, 855; see
*McGrath v. Rhode Island Retirement Bd., etc.* (1st Cir. 1996) 88
F.3d 12, 16–17; *Moro v. State* (Or. 2015) 351 P.3d 1, 20–22.)[1]

Of course, not every statute or ordinance providing an
employment benefit (or even every aspect of a statutory
pension program) constitutes an implied offer for a unilateral
contract, and thus not every future benefit is the subject of a
vested right; if that were so, the implied-right exception would
swallow the general rule that the terms and conditions of
public employment are set by statute rather than contract.
(Maj. opn., *ante*, at pp. 16, 35–36.)  Our cases have treated
deferred compensation programs, such as pension plans, as
special in this regard.  An understanding of why these
programs create implied vested rights is important to our
understanding of why the particular program at issue here
does not.

Deferred compensation programs provide a particularly
clear case for formation of an implied unilateral contract.

---

[1]    We often ask whether a statute creates implied vested
rights, but when the terms of a pension plan are set by statute
for all public employers participating in the plan, it is the
employer's offer of employment subject to the plan, rather than
the statute itself, that constitutes the contractual offer.  (See
*Moro v. State, supra,* 351 P.3d at p. 21 ["Although the [Public
Employee Retirement System] contract results from an offer
and acceptance, the PERS statutes are themselves not an offer
that employees can accept.   Instead, each participating
employer offers a promise to its employees to provide
compensation, including PERS benefits, in exchange for the
employees' services."].)

Monetary compensation, whether received periodically for work performed during the period or deferred until retirement in the form of a pension benefit, is the central consideration for which public employees, like other workers, enter and continue in employment. An implied contractual promise protecting this type of pension right arises because neither party could reasonably understand a deferred compensation offer to be revocable at will after employment. (See *Brant v. California Dairies, Inc.* (1935) 4 Cal.2d 128, 133 [intent of contractual parties determined objectively from their words and conduct]; *Meyer v. Benko* (1976) 55 Cal.App.3d 937, 942–943 [mutual assent to contract determined by "what the outward manifestations of consent would lead a reasonable person to believe"]; 1 Witkin, Summary of Cal. Law (11th ed. 2017) Contracts, § 767, p. 821.) No reasonable employee would agree to defer significant portions of his or her compensation without a vesting guarantee, and no reasonable employer would imagine that employees had agreed to work on such terms.

None of this is true of the opportunity to purchase ARS credits provided by Government Code section 20909. For reasons the majority opinion discusses, the parties could not reasonably have understood that opportunity as an offer that could be accepted simply by employment in a participating California Public Employees' Retirement System agency. (Maj. opn., *ante*, at pp. 34–35.) Among other things, no new service was required of public employees who had already served five years when section 20909 was enacted (a period corresponding to the general pension vesting period and to the requirements of federal tax law) and purchasers had to pay the full estimated value of the additional credits under Government

Code sections 20909 and 21052.  Objectively speaking, a party looking at this arrangement would understand that the ARS purchase option was not offered in exchange for any period of public service but rather in exchange for the statutorily mandated purchase price.  (See *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 677–678 [parties' intent to agree on implied contractual terms is determined from their conduct]; Rest.2d Contracts, §§ 19, 30, com. d, p. 86, 71, com. b, p. 173 [terms of offer and acceptance governed by objective manifestations of assent].)  The offer was one that could be accepted only by the employee's election and actual purchase of ARS credits, not simply by staying on the job.

For these reasons, I agree with the majority:  No implied unilateral contract arose simply from an employee's entering or continuing in public service during the period the ARS program was in force.  As a consequence, the contract clause of the California Constitution did not protect the right to purchase ARS credits from later alteration or revocation.


**KRUGER, J.**

**I Concur:**

**LIU, J.**

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Cal Fire Local 2881 v. California Public Employees' Retirement System
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 7 Cal.App.5th 115
**Rehearing Granted**

_____

**Opinion No.** S239958
**Date Filed:** March 4, 2019
_____

**Court:** Superior
**County:** Alameda
**Judge:** Evelio M. Grillo

_____

**Counsel:**

Carroll, Burdick & McDonough, Messing Adam & Jasmine, Gary M. Messing, Gregg McLean Adam, Jason H. Jasmine and Yonatan L. Moskowitz for Plaintifffs and Appellants.

Olson, Hagel & Fishburn, Christopher W. Waddell, Lance H. Olson, Deborah B. Caplan and Richard C. Miadich for Californians for Retirement Security as Amicus Curiae on behalf of Plaintifffs and Appellants.

Silver, Hadden, Silver and Levine, Stephen H. Silver and Jacob A. Kalinski for Ventura County Professional Fire Fighters Association as Amicus Curiae on behalf of Plaintifffs and Appellants.

Mastagni Holstedt, David E. Mastagni, Isaac S. Sevens, Jeffrey R.A. Edwards and Erich A. Knorr for Lake County Correctional Officers' Association, Mendocino County Deputy Sheriffs' Association, Merced City Firefighters, International Association of Firefighters, Local 1479, AFL-CIO, Napa City Firefighters Association, International Association of Fire Fighters, Local 3124, AFL-CIO, Palo Alto Firefighters, International Association of Fire Fighters, Local 1319, AFL-CIO, Sacramento Area Firefighters, International Association of Firefighters, Local 522, AFL-CIO, Santa Clara County Correctional Officers Association, Deputy Sheriffs' Association of Alameda County, El Dorado County Deputy Sheriff's Association, Ontario Police Officers' Association, Sacramento Police Officers Association and Sacramento County Deputy Sheriff's Association as Amici Curiae on behalf of Plaintifffs and Appellants.

Leonard Carder, Peter W. Saltzman, Kate Hallward and Arthur Liou for Amalgamated Transit Union Local 1225, Amalgamated Transit Union Local 1555, International Brotherhood of Electrical Workers Local 1245, International Federation of Professional and Technical Engineers Local 21, Marin Association of Public Employees, Operating Engineers Local Union No. 3 and Physicians' and Dentists' Organization of Contra Costa as Amici Curiae on behalf of Plaintifffs and Appellants.

**Counsel:**

Rains Lucia Stern St. Phalle & Silver, Stephen H. Silver and Timothy K. Talbot for Los Angeles Police Protective League, Ventura County Deputy Sheriffs' Association, California Association of Highway Patrol, Garden Grove Police Association, California Statewide Law Enforcement Association, Orange County Employees' Association, Los Angeles County Professional Peace Officers' Association, Association for Los Angeles Deputy Sheriffs, Deputy Sheriffs' Association of Santa Clara, Fresno Deputy Sheriffs' Association, Coalition of Santa Monica City Employees and Antioch Police Officers' Association as Amici Curiae on behalf of Plaintifffs and Appellants.

Reich, Adell & Cvitan, Marianne Reinhold, Laurence S. Zakson and Aaron G. Lawrence for Orange County Attorneys Association and Orange County Mangers Association as Amici Curiae on behalf of Plaintifffs and Appellants.

Rothner, Segall & Greenstone and Glenn Rothner for American Federation of State, County and Municipal Employees, American Federation of Teachers, National Education Association, Service Employees International Union, California Faculty Association, California Federation of Teachers and California Teachers Association as Amici Curiae on behalf of Plaintifffs and Appellants.

Matthew G. Jacobs, Wesley E. Kennedy and Preet Kaur for Defendant and Respondent.

Brian J. Bartow and Scott S. Brooks for California State Teachers' Retirement System as Amicus Curiae on behalf of Defendant and Respondent.

Jonathan M. Coupal; Benbrook Law Group, Bradley A. Benbrook and Stephen M. Duvernay for Howard Jarvis Taxpayers Association and Ventura County Taxpayers Association as Amici Curiae on behalf of Defendant and Respondent.

Kamala D. Harris and Xavier Becerra, Attorneys General, Douglas J. Woods and Thomas S. Patterson, Assistant Attorneys General, Tamar Pachter and Nelson Ryan Richards, Deputy Attorneys General; Peter A. Krause and Rei R. Onishi for Intervener and Respondent.

Atkinson, Andelson, Loya Ruud & Romo, Anthony P. De Marco and Joshua E. Morrison for Association of California School Adminstrators as Amicus Curiae on behalf of Intervener and Respondent.

Jones Day, Beth Heifetz, G. Ryan Snyder and Karen P. Hewitt for California Business Roundtable as Amicus Curiae on behalf of Intervener and Respondent.

Renne Sloan Holtzman Sakai, Jonathan Holtzman and Linda M. Ross for League of California Cities as Amicus Curiae on behalf of Intervener and Respondent.

Bruce D. Goldstein, County Counsel (Sonoma), Debbie F. Latham, Chief Deputy County Counsel; and Dennis Bunting, County Counsel (Solano) for County of Sonoma and County of Solano as Amici Curiae on behalf of Intervener and Respondent.

Lounsbery Ferguson Altona & Peak, Kenneth H. Lounsbery, James P. Lough and Alena Shamos for City of Pacific Grove as Amicus Curiae on behalf of Intervener and Respondent.

**Page 3 – S239958 – counsel continued**

**Counsel:**

Gibson, Dunn & Crutcher, Daniel M. Kolkey, Perlette Michèle Jura, Theodore M. Kider and Samuel D. Eisenberg for Pacific Research Institute as Amicus Curiae on behalf of Intervener and Respondent.

Greines, Martin, Stein & Richland and Timothy T. Coates for Los Angeles County Employees Retirement Association as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Greg McLean Adam
Messing Adam & Jasmine
235 Montgomery Street, Suite 828
San Francisco, CA  94104
(415) 266-1800

Rei R. Onishi
Deputy Legal Affairs Secretary
Office of Governor Edmund G. Brown, Jr.
State Capitol, Suite 1173
Sacramento, CA  95814
(916) 445-0873